# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

| | | |
|---|---|---|
| DAVID HOSIER, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 4:20-CV-04044-RK |
| | ) | |
| TRAVIS CREWS, | ) | |
| | ) | |
| Respondent. | ) | |

## ORDER

Petitioner David Hosier, a convicted state prisoner confined in the Jefferson City Correctional Center, has filed this federal petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons set forth below, this petition is **DENIED**, and a certificate of appealability is **DENIED**.[1]

## I.  Statement of Facts

Petitioner does not challenge the sufficiency of the evidence. Relevant to Petitioner's claims are the following facts:[2]

The bodies of Angela Gilpin (Victim) and Rodney Gilpin (Husband) were found in the hallway of their apartment building on September 28, 2009.[3] The Jefferson City Police Department (JCPD) found 9-millimeter shell casings in the foyer and in the apartment. An autopsy conducted the next day revealed that Victim died from gunshot wounds to the head and torso, and Husband died from gunshot wounds to the chest. Victim was wearing her purse, which contained an application for a protective order from Petitioner. The application stated Victim and Petitioner were "ex-lovers, he knows everywhere i [sic] go, who i [sic] go with, who comes to my home and

---

[1]  On review of the record, Respondent's position is found persuasive. Portions of Respondent's brief are adopted without further citation.

[2]  "[F]ederal habeas courts must make as the starting point of their analysis the state courts' determinations of fact . . . ." *Williams v. Taylor*, 529 U.S. 362, 387 (2000). "[A] determination of a factual issue made by a [s]tate court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). In this case, Petitioner fails to rebut any of the state court's determination of the facts with clear and convincing evidence. Accordingly, the facts are drawn in large part from the opinion of the Missouri Supreme Court on direct appeal without further citation. *State v. Hosier*, 454 S.W.3d 883 (Mo. banc 2015).

[3]  Although police found two victims, the Missouri Supreme Court noted the case stems only from charges brought against Petitioner for Victim's death.

is harassing me calling JCPD for no reason." She further wrote "he stalkes [sic] me every day, has called JCPD on me Sat. Monday." She also indicated she was afraid because Petitioner had a violent history with an ex-wife. Victim signed the form under penalty of perjury. On a separate form used for obtaining service, she indicated Petitioner had "lots of firearms." Victim applied for the order of protection two weeks before the murder, and a hearing was set for four days before the murder. The record does not indicate whether the hearing was held; however, Petitioner's landlord testified a sheriff's deputy attempted to serve Petitioner with process but Petitioner was out of town.

During the investigation, JCPD learned that Petitioner and Victim had been involved in an "on again, off again" romantic relationship that Victim had ended when she reconciled with Husband during the month before the murders of September 28, 2009. The apartment building was locked, and there were no signs of forcible entry. In the hours after the deaths were discovered, JCPD spoke with various people who knew Victim, Husband, and Petitioner, including their landlord, two neighbors, and Petitioner's former employer. The landlord informed JCPD that Petitioner's apartment overlooked Victim's apartment, and that Victim had requested a new apartment because she no longer wanted to live near Petitioner. The landlord provided a copy of a letter Victim had written to him stating she had filed for a restraining order against Petitioner and she was afraid because she did not know what Petitioner would "do next."

At trial, a redacted copy of the letter was admitted, as follows:

> Dear Dennis,
> This is Angela Gilpin, 1100 W. High apt. 2. I am writing you ,to inquire as to weather you may have any other apartment rentals anywhere else in town. I can no longer live next door to Dave Hosier. . . . I have gone to the Court House and filled for a restraining order. . . .
> Anyway, If you have anything else, I would be interested in looking. I have liked my apartment, and renting from you. I'm sorry for all the B.S. Believe me, he scares me. I don't know what he will do next.
>
> Sincerely,<br>Angie.

*State v. Hosier*, 454 S.W.3d 883, 898 n.8 (Mo. banc 2015) (reproduced as it appeared in record). The landlord also provided police with a criminal background check indicating Petitioner had been convicted of assault and battery in Indiana. The landlord added he recently told Petitioner that he was no longer permitted to enter Victim's apartment building because Victim complained

2

Petitioner had entered her apartment without permission.[4]  The landlord also asked Petitioner to move out by the end of September because of the growing tension.

JCPD also contacted a neighbor who had socialized with Victim the night before her death. Petitioner had left several voice messages on the neighbor's cell phone that night that were threatening toward Victim.  In one message, Petitioner stated that he was going to "f****** finish it.  I'm tired of the s***.  You don't believe me.  I'm tired of the s***."  *Hosier*, 454 S.W.3d at 890 (asterisks in original).  On another occasion after Petitioner and Victim broke up, Petitioner told this neighbor that if he could not have Victim, no one could.

A second neighbor told JCPD that Petitioner had called her the night before the murders to say he had left certain possessions on her car in case something happened.  He also told her he was going to "eliminate his problems."  The second neighbor led JCPD to her car, where they found a note and a set of keys.  The note was from Petitioner and instructed the neighbor to call Petitioner's sister if anything happened to him.  Petitioner also asked her to take care of his possessions in a storage facility.  The neighbor told police that Petitioner had previously stated Victim had "f***** him over" and he was going to "f*** her over."  *Id.* (asterisks in original).  JCPD also spoke with Petitioner's former employer.  He told them Petitioner had been "let go" because Petitioner had been harassing and stalking Victim, who had been a frequent customer.

In the hours immediately following the murders, there was no response at Petitioner's apartment and his car was not in its usual parking spot.  Relying on information gathered from the landlord, the neighbor with the threatening voicemails, and Petitioner's former employer, Missouri authorities applied for a search warrant for Petitioner's apartment.  After obtaining the search warrant for Petitioner's apartment and while executing it, police found 9-millimeter ammunition and an empty box of 9-millimeter shells, as well as the schematic for a 9-millimeter STEN machine gun ("basically a blueprint on how to make a submachine gun").

Law enforcement also applied for a cell phone ping order to determine Petitioner's location when they applied for the search warrant.  The application included an affidavit in which the swearing officer stated that Petitioner "had been identified as the primary suspect in the homicide investigation" and the location information was "essential to obtain key evidence relevant to the ongoing criminal investigation."  The ping order allowed police to determine Petitioner's location

---

[4] The Missouri Supreme Court noted Petitioner used to have access to Victim's building to do odd jobs.

in real time based on the location of his cell phone.

Executing the ping order, JCPD determined Petitioner was traveling south through Oklahoma. They alerted law enforcement officials in Oklahoma that a "wanted car and person" were in the area. An Oklahoma police officer spotted Petitioner's car and activated his emergency lights to pull him over. Petitioner did not stop and led police on a "moderate speed chase," evading one roadblock before pulling over. When Petitioner eventually stopped, he exited his car, saying, "Shoot me, and get it over with" or "end it." Police were able to put him in handcuffs and found a knife on his body. In plain view in the car, police saw a bulletproof vest, gun, and pistol holder.

Oklahoma authorities applied for a search warrant for Petitioner's car. In the application, the swearing officer stated he was alerted to Petitioner's presence in Oklahoma by JCPD and that JCPD had identified Petitioner as the primary suspect in the homicide investigation based on interviews with the neighbors. The application stated the police were aware Petitioner was in Oklahoma based on the ping order. The swearing officer stated Petitioner had violated state law by illegally possessing a firearm and failing to yield to police lights and sirens.

In searching the car pursuant to the Oklahoma warrant, police recovered two cell phones, a knife next to the driver's seat, a bulletproof vest, 400 rounds of ammunition, and 15 firearms. One of the firearms was an unloaded STEN machine gun that was capable of firing 9-millimeter ammunition. It was the only gun in the car that was not in a bag and was later determined to be the murder weapon.

In addition, police also found two notes. One note had Victim's vehicle information written on it. The other note offered incriminating evidence that Petitioner had harmed someone. It stated:

> If you are going with someone do not lie to them, do not play games with them, do not f*** them over by telling other people things that are not true, do not blame them for things that they have not done. Be honest with them and tell them if there is something wrong. If you do not this could happen to YOU!! People do not like being f***** with, and after so much s*** they can go off the deap [sic] end!! Had to [sic] much s***!!!

Petitioner was charged with first-degree murder, armed criminal action, first-degree burglary, and unlawful possession of a firearm by a felon. The jury found Petitioner guilty on all counts.

During the penalty phase of the trial, the government presented evidence that Petitioner

4

had assaulted his ex-wife and also was convicted of assault and battery for handcuffing and beating another ex-girlfriend until she was unconscious. Additionally, there was evidence that Petitioner had threatened other people before the murder. Petitioner presented mitigating evidence from his mother, sister, pastor, and ex-wife.

The jury recommended a death sentence after finding two statutory aggravating circumstances: (1) that Petitioner had previously been convicted of a serious assault, and (2) that Petitioner had murdered Victim while committing another unlawful homicide. On November 26, 2013, the trial court sentenced him to death on the murder charge, 15 years in prison for armed criminal action, 15 years for burglary, and 7 years for being a felon in possession of a firearm.

On February 3, 2015, the Missouri Supreme Court affirmed Petitioner's conviction on direct appeal. *Hosier*, 454 S.W.3d 883. On December 10, 2019, the Missouri Supreme Court affirmed the motion court's denial of post-conviction relief. *Hosier v. State*, 593 S.W.3d 75 (Mo. banc 2019).

Further facts are set forth as necessary.

## II. Standard

State prisoners who believe they are incarcerated in violation of the Constitution or laws of the United States may file a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Before doing so, petitioners must exhaust their state remedies, as Petitioner has done in part in this case. *See Coleman v. Thompson*, 501 U.S. 722, 732 (1991).

"[H]abeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011) (citation and quotation marks omitted). This Court's review of the petition for habeas corpus is limited by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254. *Id.* at 97. AEDPA "bars relitigation [in federal court] of any claim adjudicated on the merits in state court, subject only to the exceptions in §§ 2254(d)(1) and (2)." *Harrington*, 562 U.S. at 98. Accordingly, a state habeas petitioner is not entitled to relief unless the state court proceedings:

> (1) resulted in a decision that is contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §§ 2254(d).

As to § 2254(d)(1), a state court violates the "contrary to" clause if it "applies a rule that contradicts the governing law set forth" by the Supreme Court or if the state court "confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a [different] result." *Williams v. Taylor*, 529 U.S. 362, 406 (2000). A state court violates the "unreasonable application" clause of § 2254(d)(1) if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id*. at 407. "It is not enough for us to conclude that, in our independent judgment, we would have applied federal law differently from the state court; the state court's application must have been objectively unreasonable." *Flowers v. Norris*, 585 F.3d 413, 417 (8th Cir. 2009) (citation omitted).

As to § 2254(d)(2), "a petitioner must show that the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." *Perry v. Kemna*, 356 F.3d 880, 889 (8th Cir. 2004) (internal quotation omitted). A state court's factual determinations are presumed correct and will stand unless the petitioner rebuts this presumption with clear and convincing contrary evidence. 28 U.S.C. § 2254(e)(1); *Grass v. Reitz*, 749 F.3d 738, 743 (8th Cir. 2014). Additionally, federal courts afford great deference to a state court's credibility findings. *Smulls v. Roper*, 535 F.3d 853, 864 (8th Cir. 2008) (en banc).

## III.    Analysis

Petitioner raises thirteen grounds for relief. For the reasons set forth below, Petitioner's claims are denied either because they are procedurally defaulted, or because the Missouri Supreme Court did not reach a decision (1) that contradicted or unreasonably applied clearly established federal law, or (2) that was based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

### A.  Ground One – Right to Confrontation

Petitioner contends "multiple pieces of hearsay were admitted" at his trial in violation of the Confrontation Clause to  the Sixth Amendment.[5] The Missouri Supreme Court reviewed this

---

[5]  Respondent asserts Petitioner failed to satisfy Rule 2(c) of the Rules Governing Habeas Corpus Cases Under Section 2254, inasmuch as Petitioner does not specify "specific, particularized facts which entitle him . . . to relief." *See Adams v. Armontrout*, 897 F.2d 332, 333-34 (8th Cir. 1990) (holding that "to substantially comply with the Section 2254 Rule 2(c), a petitioner must state specific, particularized facts

6

claim and noted its standards of review were de novo as to challenges concerning the Confrontation Clause and abuse of discretion as to challenges concerning admission of evidence. The state supreme court then recited background law as to the Confrontation Clause, including *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004), and *Davis v. Washington*, 547 U.S. 813, 822, 829 (2006), and analyzed the merits of the claim as to (1) Victim's application for an order of protection, and (2) statements Victim made to the landlord about Petitioner and the letter she sent the landlord, as follows:

> At trial, the state introduced the Victim's application for an order of protection against Defendant that was found on her body the night of the murders. Some statements from the application were read to the jury, although it was not published to the jury. The prosecutor relied on the following statements from the document during his closing argument: "Ex-lovers. He knows everywhere I go, who I go with, who comes to my home, and is harassing me, calling JCPD for no reason. . . . He stalks me every day, has called JCPD on me Sat., Monday."

> Assuming the statements were inadmissible under the confrontation clause, they are admissible under the forfeiture by wrongdoing doctrine. This doctrine provides that if the defendant procured the declarant's absence with the intent of preventing the declarant from testifying against the defendant, then the declarant's hearsay statements may be admissible. *Giles v. California*, 554 U.S. 353 (2008). *Giles* addresses the intersection of the confrontation clause and the forfeiture by wrongdoing doctrine in the context of abusive relationships:

>> Acts of domestic violence often are intended to dissuade the victim from resorting to outside help, and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions. Where such an abusive relationship culminates in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution – rendering her prior statements admissible under the forfeiture doctrine. Earlier abuse, or *threats of abuse*, intended to dissuade the victim from resorting to outside help would be highly relevant to

---

which entitle him or her to habeas corpus relief for each ground specified." The petitioner's "facts must consist of sufficient detail to enable the court to determine, from the face of the petition alone, whether the petition merits further habeas corpus review." The Court need not resolve this challenge because Petitioner is clear that he is seeking relief only to the extent the ground was reviewed by the Missouri Supreme Court (Doc. 9 at 47; Doc. 18 at 20-21). In other words, Petitioner challenges the state court's ruling and does not seek review of defaulted claims. Thus, this Court proceeds to the merits of the claim and reviews the claim to the extent it was raised to the Missouri Supreme Court. As to any defaulted arguments, Petitioner would not be afforded relief under *Martinez v. Ryan*, 132 S.Ct. 1309, 1315 (2012) (set out more fully below) or otherwise because the claim is not substantial and there is no prejudice.

this inquiry, as would evidence of ongoing criminal proceedings at which the victim would have been expected to testify.

*Id.* at 377 (emphasis added).

Shortly after *Giles* was decided, this Court applied the forfeiture by wrongdoing doctrine in *State v. McLaughlin*, 265 S.W.3d 257 (Mo. banc 2008).[6] In *McLaughlin*, the defendant was on trial for the first-degree murder of his ex-girlfriend. In the course of ending their relationship, the victim had filed for multiple protective orders against the defendant. At the time of her death, there were pending abuse and burglary charges against him in which she was the complaining witness. This Court found that the victim's statements regarding requests for police protection and the defendant's harassing and threatening conduct towards her was admissible under *Giles*. *Id.* at 272. It noted that there was ample evidence that defendant had killed the victim to keep her from testifying, such as the fact that she made the statements while trying to end their relationship and that she had sought various orders of protection. *Id.* at 273 n.10.

As in *McLaughlin*, the forfeiture by wrongdoing doctrine applies in this case. There was ample evidence from the neighbors, the landlord, and Defendant's former employer that Defendant had been harassing Victim before her death and that Victim had sought judicial intervention. While there was not an active order of protection against Defendant, Victim had applied for a protective order, and Defendant was not served because he was out of town. Under *Giles* and *McLaughlin*, Victim's statements were admissible under the forfeiture by wrongdoing doctrine as Defendant's actions were intended to cause Victim to be unavailable to testify.

*Hosier*, 454 S.W.3d at 897.

Petitioner similarly claims statements Victim made to the landlord and the letter she sent to the landlord were inadmissible hearsay. The landlord testified Victim told him Petitioner had entered her apartment without her permission, which led the landlord to tell Petitioner he no longer had permission to enter Victim's apartment building. In the letter, Victim requested a new apartment because she was afraid of Petitioner. The Missouri Supreme Court additionally affirmed

---

[6] The Missouri Supreme Court's adjudication of the forfeiture by wrongdoing doctrine in *McLaughlin* was not disturbed on federal habeas review. *See McLaughlin v. Steele*, 173 F.Supp.3d 855, 900-901 (E.D. Mo. Mar. 22, 2016), *rev'd and remanded on other grounds*, *McLaughlin v. Precythe*, 9 F.4th 819 (8th Cir. 2021).

the trial court as to the admission of this evidence under the *Giles* forfeiture doctrine.[7, 8]

The crux of Petitioner's argument is that the state supreme court's application of *Giles* was erroneous because the State never argued (and the evidence did not support) that the murder involved any motivation to prevent Victim from being a witness against Petitioner. In other words, Petitioner claims that for the exception to apply, the intent to prevent testimony as the motivation for the murder must be eminently clear. In response, Respondent argues the record supports the state court's finding that the *Giles* doctrine indeed applies because the record contained sufficient evidence to allow the state court to infer from the record that Petitioner killed Victim with the intent to prevent her testimony. This Court agrees with Respondent that the record contains sufficient evidence to allow the state court to infer intent because, *inter alia*, there was ample evidence from the neighbors, the landlord, and Petitioner's former employer that Petitioner had been harassing Victim before her death. Additionally, key to this case, just two weeks before the murder, Victim had sought and obtained an *ex parte* order of protection in which she swore under oath that Petitioner was stalking her daily and he had engaged in acts of vandalism and harassment towards herself and her family; a copy of that document was found in Victim's purse when her

---

[7] The Missouri Supreme Court defined testimonial hearsay statements but undertook no analysis as to whether any of the statements at bar are non-testimonial. Instead, the Court assumed without deciding that all challenged statements were inadmissible under the Confrontation Clause. This Court agrees with Respondent that the letter to the landlord was not testimonial, taking that piece of evidence outside the purview of the Confrontation Clause. *See Crawford*, 541 U.S. at 51 (testimony is a "solemn declaration or affirmation made for the purposes of establishing or proving some fact."); *United States v. Wright*, 536 F.3d 819, 823 (8th Cir. 2008) ("statements to friends and neighbors about abuse and intimidation . . . are not testimonial") (quoting *Giles*, 554 U.S. at 376). The record reflects the letter was not in response to police questioning, not written in a coercive atmosphere, not addressed to law enforcement or any other public authority, and the declarant had no reason to believe it would become part of a legal proceeding. Nevertheless, the state court correctly ruled that, assuming the letter is testimonial, its admission (as well as that of the *ex parte* application) falls squarely within the forfeiture by wrongdoing exception.

[8] The Missouri Supreme Court cited "ample" evidence that Petitioner killed Victim to keep her from testifying, as excerpted above. Respondent notes that courts outside of Missouri and the Eighth Circuit have applied a preponderance-of-the-evidence standard in determining whether to apply the forfeiture by wrongdoing exception and that the Eighth Circuit does not appear to have addressed the appropriate standard that applies to the Confrontation Clause exception. *See, e.g.*, *Carlson v. Attorney Gen. of Cal.*, 791 F.3d 1003, 1005 (9th Cir. 2015); *United States v. Johnson*, 767 F.3d 815, 822 (9th Cir. 2014); *United States v. Dinkins*, 691 F.3d 358, 383 (4th Cir. 2012). For the reasons set forth here, assuming the preponderance standard applied here, it was more than met. More to the point, however, Petitioner cannot show the state court's fact finding is rebutted by clear and convincing evidence or its decision runs afoul of clearly established federal law.

9

body was found.[9]  *See Carlson v. Attorney Gen. of Cal.*, 791 F.3d 1003, 1005 (9th Cir. 2015) (exploring meaning of "conduct designed to prevent a witness from testifying," and holding admission of challenged statements was not an objectively unreasonable application of Supreme Court precedent because AEDPA "demands that state-court decisions be given the benefit of the doubt," and because the trial court could have reasonably inferred from the record that petitioner directly participated in securing the victim's and witness's absence); *United States v. Cazares*, 788 F.3d 956, 974-975 (9th Cir. 2015) (district court properly applied forfeiture doctrine; noting federal courts have sought to effect the purpose of the doctrine by broadly construing the elements required for its application, and the government is not required to show a defendant's "sole purpose was to silence the declarant").

The Missouri Supreme Court did not undertake analysis assuming trial court error. *Ex gratia*, even assuming the record did not support the finding of sufficient evidence to invoke the forfeiture by wrongdoing exception, Petitioner would not be entitled to federal habeas relief on Ground One. The United States Supreme Court has held this Court's review is for actual prejudice:

> For reasons of finality, comity, and federalism, habeas petitioners are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice. Under this test, relief is proper only if the federal court has grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict. There must be more than a reasonable possibility that the error was harmful. The [relevant] standard reflects the view that a State is not to be put to the arduous task of retrying a defendant based on mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the error.

*Davis v. Ayala*, 576 U.S. 257, 267-68 (2015) (cleaned up).

Here, the Court has no grave doubt that admission of any of the challenged evidence had a "substantial and injurious effect or influence in determining the jury's verdict," even assuming erroneous admission. As noted above, evidence at trial included admission of Petitioner's statements threatening Victim's life. Petitioner told a friend if he could not have Victim, then

---

[9] The evidence supporting such a finding was further detailed at length in Respondent's brief to the Missouri Supreme Court on direct appeal and included: Petitioner was fired from his job for harassing Victim; Petitioner threatened Victim in phone calls to friends; Victim stated that Petitioner watched what she did and who came and went to her home; Victim complained that Petitioner had entered her apartment without permission and that she was forced to change her deadbolt lock; Petitioner made false police reports for the purposes of harassing her (a fact later confirmed by police); and two weeks before the murders, Petitioner told a friend he was upset because of a restraining order and an eviction notice. (Docs. 13 at 58; 13-4 at 95-99.)

10

Case 4:20-cv-04044-RK   Document 19   Filed 04/14/22   Page 10 of 48

nobody would have Victim. He stated, in reference to his difficulties with Victim, he was going to "eliminate his problems." After the murder, Petitioner was apprehended fleeing from the scene, which is evidence of consciousness of guilt. When Petitioner was apprehended, he asked law enforcement to shoot him, which is additional evidence of consciousness of guilt. Petitioner was apprehended with an arsenal of weapons, including the murder weapon.

In support of a finding that Petitioner was apprehended with the murder weapon, the Court notes nine spent 9-millimeter shell cases were recovered from the crime scene near Victim's body. Those spent cases were compared to Petitioner's STEN submachine gun, and the Missouri State Highway Patrol expert firearms examiner determined the firing pin impressions on the cartridge cases were consistent with the STEN submachine gun. A photograph of the comparison process was admitted into evidence and clearly shows an agreement in the physical markings. The expert also determined the extractor marks on at least four cartridge cases indicated the spent cartridge cases at Victim's apartment had been extracted from Petitioner's STEN submachine gun. The expert testified how the photograph from the comparison process showed an agreement in the physical extractor markings. The expert testified that a tenth cartridge case later submitted by police for examination contained sufficient individual characteristics to confirm it had been ejected from that particular submachine gun.

In addition to all of this testimony, much of the letter to the landlord was cumulative to other evidence presented, including the landlord's testimony that he evicted Petitioner because of Petitioner's conviction and because of his harassment to Victim. Petitioner's friend testified to the same information. Additionally, the statements read by the prosecutor in closing from the *ex parte* application were also cumulative to other testimony at trial, including testimony about how Petitioner watched Victim's entrance. *See Doan v. Carter*, 548 F.3d 449, 459 (6th Cir. 2008) (the jury's guilty verdict is "surely unattributable" to the admission of the affidavit, even if it was inadmissible testimonial hearsay, because the affidavit was merely cumulative of other evidence admitted against defendant" (citation omitted); *Jensen v. Clements*, 800 F.3d 892, 892-908 (7th Cir. 2015) (in case where trial was held pre-*Giles* and court allowed evidence that unequivocally violated *Giles*, habeas relief was warranted because case "was no slam dunk" and "evidence was all circumstantial" and there was significant evidence in favor of the theory that the wife had taken her own life); *James v. Marshall*, CV 06-3399-CAS(E), 2008 WL 4601238, at *16 (C.D. Cal. Aug. 13, 2008) (habeas relief warranted where (1) "[n]othing in the record shows the victim believed

11

that she or anyone else was still in danger of injury or further injury [at the time the statements were made]. . . and there was no ongoing emergency in the sense of a perpetrator being unknown or still at large"; (2) respondent did not contend, and the record did not show, that petitioner killed his wife to prevent her from testifying against him; and (3) the jury struggled to reach a verdict).

Here, because there is weighty evidence independent of the unconfronted statements, the Court does not have grave doubts about whether an assumed trial error had a substantial and injurious effect or influence in determining the jury's verdict. In turn, the Court finds the state appellate court correctly applied controlling United States Supreme Court precedent (*Giles*) in resolving Petitioner's claim concerning the Confrontation Clause. Even if there was error by the trial court, however, there was no actual prejudice.

Ground One is denied.

**B. Ground Two – Ineffective Assistance of Counsel: Prior Conviction**

Petitioner next claims trial counsel were ineffective for not stipulating during the guilt phase to his prior conviction even though trial counsel explained they did not stipulate to the conviction because they did not want the jury to be "surprised" during the penalty phase.[10]

To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show: (1) "counsel's representation fell below an objective standard of reasonableness[;]" and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687, 688 (1984). "The first prong requires a showing 'that counsel made errors so serious that counsel was not functioning as the "'counsel'" guaranteed the defendant by the Sixth Amendment.'" *White v. Dingle*, 757 F.3d 750, 752 (8th Cir. 2014) (quoting *Strickland*, 466 U.S. at 687). "The second prong requires a showing that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id*. at 753 (quoting *Strickland*, 466 U.S. at 694).

"[W]hen reviewing an ineffective-assistance-of-counsel claim, 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional

---

[10] Respondent again claims Petitioner's claim violates Rule 2(c). The Court need not resolve this challenge because, again, Petitioner's reply brief makes clear that the Missouri Supreme Court reviewed this ground (Doc. 18 at 35) and that Petitioner is challenging the state court's ruling and not seeking review of defaulted claims. Thus, this Court reviews the claim on its merits to the extent it was raised to the Missouri Supreme Court. As to any defaulted arguments, Petitioner would not be afforded relief under *Martinez*, 132 S.Ct. at 1315 (set out more fully below) or otherwise because the claim is not substantial and there is no prejudice, actual or otherwise, as detailed throughout this order.

assistance.'" *Woods v. Donald*, 575 U.S. 312, 315 (2015) (quoting *Strickland*, 466 U.S. at 689). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Harrington*, 562 U.S. at 105. "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Id.* (internal citations omitted). To grant relief under § 2254, this Court must conclude that the state court unreasonably applied the *Strickland* test or that, in reaching its conclusion regarding the performance of Petitioner's attorneys, it made unreasonable factual conclusions. *Gabaree v. Steele*, 792 F.3d 991, 996 (8th Cir. 2015) (citing *Harrington*, 562 U.S. at 131) (additional citation omitted).

In analyzing this ineffective-assistance claim on the merits, the Missouri Supreme Court noted the *Strickland* standard and reasoned as follows:

> Hosier argues trial counsel was ineffective for failing to stipulate to the prior felony conviction, which – under *Old Chief v. United States*, 519 U.S. 172 (1997) – would have prevented the jury from hearing the name and surrounding circumstances of the conviction underlying the felon-in-possession charge during the guilt phase of the trial. The state was willing to stipulate to the 1993 Indiana felony, but defense counsel declined to do so. As a result, the state was allowed to introduce during the guilt phase documents showing both the fact of the 1993 conviction and the circumstances surrounding that conviction. Hosier argues this evidence was highly prejudicial because the facts underlying that conviction involved a violent assault of a former romantic partner and Hosier was on trial for murdering another former romantic partner. Hosier asserts there was no strategic reason for counsel not to stipulate to the 1993 felony conviction and every reason to do so in order to keep this information from the jury during the guilt phase as required by *Old Chief*.

> At trial, Hosier was represented by Counsel Don Catlett, who previously had tried nine capital cases as a criminal defense attorney, and Counsel Janice Zembles, who had worked as the District Defender in the capital trial office of the Missouri Public Defender for 13 years. At the evidentiary hearing, Counsel Zembles testified that, although the prosecutor was willing to stipulate to the prior felony conviction, she did not enter into a stipulation because she did not want the jury to be surprised about the facts of the 1993 conviction when it inevitably learned of them during the penalty phase. Counsel Zembles testified that, in her experience, jurors in death penalty cases responded negatively to information introduced during the penalty phase that they believe had been withheld from them during the guilt phase. Counsel Zembles believed [Petitioner's former girlfriend, Nancy] Marshall would testify at the penalty phase because her name was on the witness list and was in a position to offer relevant and admissible evidence concerning the 1993 conviction. On balance, Counsel Zembles believed the mitigating nature of the

language in the 1993 judgment recommending psychiatric treatment outweighed any prejudice that would ensue from the state offering that judgment into evidence.

The motion court found defense counsel's decision not to stipulate to the fact of the 1993 Indiana conviction in the guilt phase to preclude angering the jury in the penalty phase when it inevitably learned of the circumstances surrounding that conviction was a reasonable trial strategy. This finding is not clearly erroneous. [Footnote omitted.]

Counsel Zembles reasonably believed that there would likely be a penalty phase of the trial – i.e., she believed Hosier likely would be found guilty of first-degree murder – and that Marshall would testify about the circumstances surrounding the 1993 Indiana conviction during that penalty phase. Her experience with juries learning in a penalty phase facts that they believed had been withheld from them in the guilt phase informed her strategic decision to get the facts surrounding the 1993 Indiana conviction out sooner rather than later. This was a reasonable trial strategy for defense counsel to make in light of the facts and circumstances as they appeared to her at the time this decision was made.

*Old Chief* is not to the contrary. *Old Chief* held a trial court abuses its discretion by not accepting a defendant's offer to stipulate to the fact of a prior conviction when the name and nature of the conviction raises the risk of unfair prejudice. *Old Chief*, 519 U.S. at 174. But nowhere does [*Old Chief*], or any other [case], impose a duty on a criminal defendant's counsel to stipulate to a past felony notwithstanding defense counsel's reasonable trial strategy to the contrary.[11]

*Hosier*, 593 S.W.3d at 82-83.

Here, Petitioner appears to argue (1) the Missouri Supreme Court's opinion was contrary to, or an unreasonable application of, clearly established Supreme Court precedent, and (2) the opinion was based on an unreasonable determination of the facts.

As to the claim concerning established precedent, Petitioner makes clear in his reply brief that his challenge relates to *Strickland*, *Wiggins v. Smith*, 539 U.S. 510 (2003), *Old Chief*, and *Michelson v. United States*, 335 U.S. 469 (1948). After review, this Court finds meritless Petitioner's contention that the state court's ruling was contrary to established precedent. First, the Missouri Supreme Court identified and correctly applied *Strickland*. Second, Petitioner did not cite *Wiggins* on appeal to the Missouri Supreme Court concerning this claim. Regardless, the

---

[11] The Missouri Supreme Court additionally determined that introduction of the evidence did not violate Missouri's pattern jury instruction, MAI-CR 3d 331.28, and that defense counsel's decision not to stipulate to a prior conviction was a reasonable matter of trial strategy.

state court's opinion does not run afoul of *Wiggins*, in which the United States Supreme Court found ineffective assistance of counsel due to the attorneys' inadequate investigation and decision not to introduce mitigating evidence of the petitioner's background. 539 U.S. 510. Third, the state court's opinion does not conflict with *Old Chief*. *Old Chief* discussed whether the admission of evidence was an abuse of discretion under Federal Rule of Evidence 403, not whether a trial was fundamentally unfair by due process standards. 519 U.S. 172. Even notwithstanding this procedural difference, the state court's ruling does not conflict with *Old Chief*, which held reversal is required where (1) the government spurns a defendant's offer to concede a prior judgment, (2) the full judgment record is admitted over the defendant's objection, (3) the name or nature of the prior offense raises the risk of a verdict tainted by improper considerations, and (4) the purpose of the evidence is solely to prove the element of prior conviction. As the Missouri Supreme Court pointed out, then, nowhere does *Old Chief* impose a duty on counsel to stipulate to a past felony conviction, notwithstanding counsel's reasonable trial strategy to the contrary. Fourth, Petitioner's reliance on *Michelson* is unavailing both because he did not raise the argument to the state courts and because the case is not on point. There, the trial court had allowed the government to ask four witnesses whether they knew the defendant had been "arrested for stolen goods." In the 1948 case, the *Michelson* Court held on direct appeal that generally, evidence of a defendant's bad character is not admissible to provide a defendant's propensity to commit the offense charged. 335 U.S. at 476. *Michelson* is thus procedurally and factually inapposite.

Petitioner additionally argues the state court opinion was based on an unreasonable determination of the facts. Petitioner represents that Catlett testified "that there was no strategic reason for not stipulating to the prior conviction nor the two motions in limine filed by the defense that sought to keep this information from the jury, as well as the inclusion of this issue in the motion for a new trial." (Doc. 9 at 62.) In fact, the record indicates that the pertinent testimony was Catlett's response to the question whether he had a strategic reason not to stipulate: "Not that I can think of." (Doc. 13-7 at 57.) Catlett also testified he did not recall any of the "specifics of the discussion" with the prosecutor before the exhibit was admitted; instead, he deferred to the record. (*Id*.) In contrast, Zembles testified as to the reasons for stipulating to the admission of the exhibit, as detailed above in the Missouri Supreme Court's opinion. "The deference owed to the state trial court pursuant to § 2254(e)(1) includes deference to its credibility determinations." *Smulls*, 535 F.3d at 864. "A federal court can only grant habeas relief if the state court's credibility

determinations were objectively unreasonable based on the record." *Id.; see also Graham v. Solem*, 728 F.2d 1533, 1540 (8th Cir. 1984) ("In the process of finding the underlying facts, credibility determinations are left for the state courts to decide; we are not permitted to substitute our judgment as to the credibility of witnesses for that of the state court."). Petitioner offers no basis on which this Court could find that it was objectively unreasonable for the state court to credit Zembles' testimony regarding the stipulation, nor has Petitioner offered clear or convincing evidence to rebut the presumption of correctness of the state court's factual findings.

Moreover, even assuming Petitioner could establish deficient performance, the Missouri Supreme Court found, and this Court agrees, that Petitioner has not established prejudice. In finding Petitioner could not show prejudice, the state court ruled as follows:

> Even if Hosier had been able to show that defense counsel's performance was constitutionally defective for failing to stipulate to the 1993 Indiana felony, his ineffective assistance claim would fail, nevertheless, because Hosier failed to show any prejudice resulted. Hosier argues the evidence relating to the prior felony conviction allowed the jury to make an improper inference that he had a propensity for violence such as that which resulted in Victim's death. He argues allowing the jury to hear this evidence was especially damaging because the case against him rested entirely on circumstantial evidence.
>
> These arguments fail for two reasons. First, the Court is not convinced – based on nothing other than Hosier's speculation – that the jury made an improper use of evidence concerning the 1993 conviction (i.e., propensity) rather than a proper use of that evidence. Second, the Court is not convinced the trial record supports a reasonable likelihood that the jury would not have found Hosier guilty of first-degree murder if they had heard only that Hosier had been convicted previously of an unspecified and unexplained felony. Instead, the record shows the jury's guilty verdict was supported by a wide range of inculpatory evidence, including evidence regarding Hosier's past relationship with Victim, Victim's fear that Hosier might kill or harm her and her husband, Victim's application for an order of protection against Hosier based on those fears, Hosier's flight shortly after the killings, Hosier's many inculpatory statements (including a note explaining his motive found in his vehicle), and the arsenal of weapons (including one determined to be the murder weapon) found in his possession at the time he was arrested. Extracting from this considerable array of evidence the circumstances surrounding Hosier's 1993 Indiana conviction falls well short of creating a reasonable probability that he would not have been found guilty on the first-degree murder charge.

*Hosier*, 593 S.W.3d at 82.

Given the record and a thorough *Strickland*-based analysis, the state court's determinations

16

did not result in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," nor is it "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d)(1) & (2). This Court reiterates Petitioner does not challenge the sufficiency of the evidence and further agrees with the Missouri Supreme Court that there is no prejudice under *Strickland*.

Ground Two is denied.

## C. Ground Three – Ineffective Assistance of Trial Counsel: Motion to Sever

Petitioner next claims trial counsel were ineffective in that they rendered deficient performance by failing to file a written motion to sever the felon-in-possession charge, and that Petitioner was prejudiced since the trial proceeded on all counts and the State was therefore allowed to present otherwise inadmissible evidence.

Following *Strickland*, the Missouri Supreme Court noted that pursuant to Missouri Supreme Court Rule 24.07, counsel should have lodged a written motion to sever, rather than relying solely on an oral motion. The state supreme court noted additionally that the motion court found counsel were not ineffective for failing to file a written motion because, as the sitting trial judge, she would have overruled a written motion had it been filed; such a ruling is committed to the sound discretion of the trial court in Missouri, and the high court saw no reason to disturb the ruling. The state court then determined that Catlett had admitted he knew Petitioner – as a prior offender – was not entitled to severance per state statute because a prior offender in a first-degree murder case can be tried for multiple offenses that are lawfully joined under state law.

The Missouri Supreme Court then concluded as follows:

[J]oinder of the felon-in-possession charge with the first-degree murder charge was permissible under section 565.004.3 [of the Revised Statutes of Missouri]. As a result, [Missouri Supreme Court] Rule 24.07 requires the written motion to sever to make "a particularized showing of substantial prejudice if the offense is not tried separately" and the trial court must make a finding that a bias or discrimination against a party exists that requires the severance and a separate trial.

At the evidentiary hearing on Hosier's postconviction relief motion, Hosier failed to show that – even in the improper oral motion – defense counsel made (or even could have made) a "particularized showing of substantial prejudice[.]" More important, Hosier failed to show that the trial court would have made a finding sufficient to grant a proper severance motion (assuming one had been made) because Judge Joyce, the motion court judge, found she considered the oral motion

to sever while sitting as the trial court and overruled it. Accordingly, even if defense counsel had filed a written motion to sever, it would have been overruled just as the oral motion to sever was.

*Hosier*, 593 S.W.3d at 85. Additionally, the Missouri Supreme Court acknowledged the analysis on direct review of the issue of admission of Petitioner's possession of 14 firearms when his car was stopped, wherein the court noted the 14 guns and ammunition were logically relevant because they were found in his car during his flight from Jefferson City after the murders and highly probative to show consciousness of guilt. The state supreme court concluded that even if defense counsel had persuaded the trial court to sever the felon-in-possession charge, the evidence of firearms could and likely would have been admitted regardless. *Id.* at 85-86.

Here, Petitioner offers several arguments in support of his claim of ineffective assistance of counsel, including that the state supreme court based its decision on a faulty inference by the motion court – namely that Petitioner's trial counsel's strategy was fronting Petitioner's criminal record to the jury in the first part of the trial to avoid surprise in the penalty phase.

Recent Eighth Circuit precedent confirms proper review by the state courts as to the claim of ineffective assistance of counsel as to a motion to sever under Missouri law:

> Severance is proper only after the defendant "'makes a particularized showing of substantial prejudice if the offense is not tried separately' and . . . the 'court finds the existence of a bias or discrimination against the party that requires a separate trial of the offense.'" *Id.* (quoting Mo. Sup. Ct. R. 24.07)). Courts consider factors such as "the number of offenses charged, the complexity of the evidence to be offered and whether the trier of fact can realistically distinguish the evidence and apply the law intelligently to each offense." *State v. Sims*, 764 S.W.2d 692, 697 (Mo. Ct. App. 1988). "The general allegation that the jury would likely consider evidence of guilt on one charge as evidence of guilt on another charge does not meet the requirement of a particularized showing of substantial prejudice." *State v. Simmons*, 158 S.W.3d 901, 909 (Mo. Ct. App. 2005) (quotation omitted). "If evidence relating to each offense is distinct and uncomplicated and the jury is properly instructed to return separate verdicts for each offense charged, the trial court does not abuse its discretion in denying a motion to sever." *State v. Tolen*, 304 S.W.3d 229, 236 (Mo. Ct. App. 2009).

*Donelson v. Steele*, 16 F.4th 559, 572 (8th Cir. 2021).

Petitioner's contention that his counsel were ineffective for failing to properly move to sever is without merit. On this record and under the *Donelson* standard, it is clear that the motion, had it been lodged properly, would have been denied. Thus, this Court agrees with Respondent

that Petitioner cannot show deficient performance as counsel cannot be ineffective for failing to file a meritless motion where the record supports the denial of the motion. *See Rodriguez v. United States*, 17 F.3d 225, 226 (8th Cir. 1994) ("[C]ounsel's failure to raise a meritless argument cannot constitute ineffective assistance.").

Petitioner's claim of prejudice also is without merit. As noted by the state court:

. . . Hosier did not show that counsel's failure to do so undermines the Court's confidence in the outcome of the guilt phase by showing there is a reasonable probability that the outcome of the trial would have been different. *See* [*State v.*] *Deck*, 68 S.W.3d [527] at 426 [(Mo. banc 2010)]. Hosier's theory is that he was unfairly prejudiced when the evidence of all 15 weapons and related ammunition was admitted in his trial, because – if counsel would have gotten the trial court to sever the felon-in-possession charge – at most only the murder weapon would have been admitted. This argument fails because this Court has already held otherwise.

\*      \*      \*

Accordingly, even if defense counsel had persuaded the trial court to sever the felon-in-possession charge, the evidence of these firearms could – and likely would – have been admitted anyway.

*Hosier*, 593 S.W.3d at 85-86. Petitioner also asserts prejudice on the ground that the jury would not have been aware of his prior felony conviction had the motion to sever been granted. However, as noted above, the jury found Petitioner guilty after the State presented a wide range of inculpatory evidence. Petitioner has not shown prejudice.

Given the record and a thorough *Strickland*-based analysis, the state court's determinations did not result in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or in "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d)(1) - (2). This Court again reiterates Petitioner does not challenge the sufficiency of the evidence and further agrees with the Missouri Supreme Court that there is no prejudice under *Strickland*.

Ground Three is denied.

19

**D. Ground Four – Ineffective Assistance of Trial Counsel:  Closing Argument at the Penalty Phase**

Petitioner next contends trial counsel were ineffective for not "properly" objecting to the prosecutor's closing argument during the penalty phase.  The Missouri Supreme Court summarized and reviewed the claim as follows:

> Hosier claims defense counsel were ineffective for failing to make a proper objection to a statement made during the state's closing argument.  The relevant portion of the transcript provides:

>> [PROSECUTOR]: [T]he [s]tate urges you to find beyond a reasonable doubt those two aggravating circumstances and that this evidence in aggravation outweighs any evidence of mitigation, and then consider the death penalty as the just verdict in this case.
>>     And in courts, jurors talk oftentimes – or people talk and then talk about justice and doing one thing or the other and whether something would actually get done or not.  And for purposes of making that decision, I've worked on death penalty cases as a prosecutor.  And the last four to five that I've worked on have been executed.

>> [DEFENSE COUNSEL]: Judge, I'm going to object to this.

>> [PROSECUTOR]: They've been executed.

>> [DEFENSE COUNSEL]: I'm going to object at this point.  May I approach if you think it's necessary?
>> (Counsel approached the bench, and the following proceedings were had:)

>> [DEFENSE COUNSEL]: It's inappropriate closing argument.  If [the state] is preparing to imply or explicitly state to this jury or even imply that he has some special knowledge that hasn't been evidence in this courtroom –

>> [PROSECUTOR]: The next sentence, Your Honor, is "And you will have to accept that if you give him the death sentence he will be executed."

>> THE COURT: Okay.
>> (Proceedings returned to open court.)

>> [PROSECUTOR]: As I was saying before the objection there, and you as jurors will have to base your decision if you give death that

he will certainly be executed. In other words, have no doubt about
that.

Hosier claims counsel should have objected on the grounds that the state
was arguing facts not in evidence and, if this objection had been made, it would
have (or, at least, should have) been sustained. The motion court denied relief on
this claim, finding there was no error by defense counsel or any prejudice to Hosier
assuming there had been error. These findings are not clearly erroneous.

Hosier's argument fails in its premise. Any reasonable reading of the
portion of the transcript set forth above shows defense counsel made the objection
Hosier now claims they should have made, i.e., that the state was arguing facts not
in evidence. The trial court did not sustain this objection, but only after the state
assured the court it was heading toward safer (or, at least, less objectionable)
ground. Whether the trial court acted properly is not before this Court in this
postconviction relief proceeding. Such matters are for direct appeal, and Hosier
did not raise this issue in his direct appeal. In this postconviction proceeding, the
Court is concerned only with whether Hosier received constitutionally effective
assistance of counsel, and defense counsel cannot be said to have fallen short of
this standard when they made the only objection Hosier asserts they should have
made.

*Hosier*, 593 S.W.3d at 92-93. Petitioner argues his counsel rendered ineffective assistance by not

objecting properly during the prosecutor's closing argument and not properly preserving the issue

for direct appeal. Petitioner claims counsel failed to obtain a ruling, did not address the

constitutional basis for the objection, and did not address all of the reasons the prosecutor's

argument was improper.[12]

On federal habeas review, the Court asks whether the prosecutor's comments "so infected

the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v.

Wainwright*, 477 U.S. 168, 181 (1986). Despite the same test applying to guilt-phase arguments,

a more searching review should be done of the penalty-phase arguments. *Copeland v. Washington*,

232 F.3d 969, 974 n.2 (8th Cir. 2000) ("if there is any distinction between guilt and penalty phase

arguments, it would seem that there should be a more searching review of the penalty phase").

---

[12] The Missouri Supreme Court additionally noted defense counsel did not reassert their closing
argument objection in the motion for a new trial and Petitioner did not claim their failure to do so or failure
to raise the issue on direct appeal constituted ineffective assistance of counsel. To that end, Respondent
correctly notes the matter is procedurally defaulted because Petitioner failed to properly raise the claim in
the state court. Although this claim is addressed to the extent it was raised in the state court, Petitioner
would not be afforded relief under *Martinez* on any related defaulted arguments or otherwise because, again,
the claims are not substantial and there is no prejudice.

21

With that standard in mind and after review of the record and law, the Court finds the state court's determinations did not result in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or in "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d)(1) - (2); *Cole v. Roper*, 623 F.3d 1183, 1195-96 (8th Cir. 2010) (denying relief where closing arguments in penalty phase described the death penalty as "a weapon we need to have in our arsenal to fight crime," and comparing the jury to "'patriots' who need to step up to protect society");  *Storey v. Roper*, 603 F.3d 507, 525 (8th Cir. 2010) (closing argument highlighting the victim impact evidence that did not make a point of comparing the value of the lives of the victim and the defendant was not unreasonable application of *Strickland*); *Johnston v. Luebbers*, 288 F.3d 1048, 1057 (8th Cir. 2002) (denying relief where petitioner and court's research did not indicate any cases ruling that closing remarks were either improper as a matter of federal constitutional law or resulted in sufficient prejudice to merit habeas relief and where petitioner did not show that any specific factual finding made by the state court was unreasonable); *Simmons v. Bowersox*, 235 F.3d 1124, 1136 (8th Cir. 2001) (where prosecutor's arguments were held to be "sprinkled with improper comments," closing argument "did not dilute the gravity of a death sentence or place the responsibility of imposing a capital sentence in hands other than those of the jurors" and thus no habeas relief was warranted).  Petitioner has not directed the Court to any case indicating the remarks are either improper as a matter of federal constitutional law or resulted in sufficient prejudice to merit habeas relief.

Ground Four is denied.

## E.  Ground Five – Ineffective Assistance of Trial Counsel:  Ballistics Evidence

Petitioner next argues trial counsel were ineffective for not investigating, seeking to exclude, or hiring an expert to contest the state's ballistics evidence.

Petitioner concedes this claim is procedurally defaulted.  As noted above, a petitioner must exhaust state remedies.  In other words, to avoid procedurally defaulting on a claim, a federal habeas petitioner must have first fairly presented the substance of the claim to the state courts to afford the state courts a fair opportunity to apply controlling legal principles to the facts pertinent to the claim. *Wemark v. Iowa*, 322 F.3d 1018, 1020-21 (8th Cir. 2003); *see also Baldwin v. Reese*, 541 U.S. 27, 29 (2004).  A claim has been fairly presented when a petitioner has properly raised

the same factual grounds and legal theories in the state courts that he is attempting to raise in his federal petition. *Wemark*, 322 F.3d at 1021 (internal quotation marks and citations omitted). Claims that have not been fairly presented to the state courts are procedurally defaulted. *Id*. at 1022 (quoting *Gray v. Netherland*, 518 U.S. 152, 161-62 (1996)); *Smith v. Groose*, 998 F.2d 1439, 1441 (8th Cir. 1993) (citation omitted) (holding that failure to comply with state procedural requirements "serves as an adequate and independent state procedural bar to review.").

This Court may not review procedurally defaulted claims "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

Here, Petitioner contends he is entitled to review through *Martinez v. Ryan*, in which the Supreme Court recognized a "narrow exception" to *Coleman* by holding that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 566 U.S. 1, 9 (2012). The primary concern in *Martinez* "is the prisoner's potential inability – caused by ineffective counsel or a complete lack of counsel altogether – to present the merits of his ineffective assistance claim to some court with the authority to decide the matter." *Franklin v. Hawley*, 879 F.3d 307, 312 (8th Cir. 2018).

To excuse a procedural default under *Martinez*, the underlying claim of ineffective assistance of trial counsel must be "substantial," and postconviction counsel must have been constitutionally ineffective with respect to the claim. *Martinez*, 556 U.S. at 14. A claim is "substantial" if it has "some merit" and "insubstantial" if "it does not have any merit or . . . is wholly without factual support." *Id.* at 14-16 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)); *Kemp v. Kelley*, 924 F.3d 489, 499 (8th Cir. 2019).[13]

_____

[13] A petitioner must also show that the state post-conviction relief proceeding was the initial review proceeding, and state law required (or forced as a practical matter) the petitioner to bring the claim in the initial review collateral proceeding. *Trevino v. Thaler*, 569 U.S. 413, 423 (2013). Here, there is no dispute as to these elements because Missouri does not permit a petitioner to bring an ineffective assistance of counsel claim on direct appeal. *Martinez*, 556 U.S. at 4. Rather, Missouri law requires a petitioner to bring such a claim in a collateral review proceeding. To that end, Missouri Supreme Court Rule 29.15 provides the exclusive procedure by which a person convicted of a felony may seek relief for certain claims, including ineffective assistance of counsel; Rule 29.15(a) requires these claims for relief are to be brought in the *sentencing* court.

23

The Court finds Petitioner fails to establish that his ineffectiveness claim based on trial counsels' failure to investigate, seek to exclude, or hire an expert to contest the ballistics evidence is substantial. As Respondent notes, Petitioner does not provide meaningful factual material that would support the claim of relief under either Rule 2(c) of the Rules Governing Section 2254 Proceedings or *Martinez*'s requirement that the claim not be "wholly without factual support." *Id.* at 16. For example, although Petitioner contends his counsel should have hired an expert witness, he does not "name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) (citation omitted), *cited with approval by Rodela Aguilar v. United States*, 596 F.3d 457, 462 (8th Cir. 2010).

Further, Petitioner cannot establish his post-conviction counsel were ineffective for failing to raise the claim under *Strickland*. As to the performance prong, the record reflects trial counsel conducted a lengthy cross-examination of the State's ballistics expert. Trial counsel elicited testimony from the ballistics expert that multiple firearms manufacturers worldwide have developed multiple weapons that fire 9 millimeter ammunition. Trial counsel were able to have the expert concede that ballistics evidence "cannot show us when a shooting occurred," who was holding a firearm at the time of a shooting, or explain the circumstances around a shooting, including what someone may have been thinking at the time of a shooting. Trial counsel also questioned the expert about the alleged subjectivity on the part of the examiner for ballistics evidence. Also during cross-examination, the State's expert admitted that class characteristics only limited the potential pool of firearms somewhat, e.g. that an ejector mark may be the same on "thousands and thousands and thousands of guns." Trial counsel also highlighted that some of the ballistics evidence presented at trial was "inconclusive" and that the expert could not link the firing pin from the STEN submachine gun to any of the cartridge cases. Trial counsel also highlighted that none of the cartridge cases had identifying breach marks, and that the expert did not photograph the ejector or extractor marks he used to link the cartridge cases to the STEN submachine gun. Later, trial counsel highlighted that there is no "protocol in the lab or standardized protocol nationally" for making an identification. Trial counsel concluded by pointing out that the Missouri State Highway Patrol sends a testimony evaluation form to the party subpoenaing the expert for testimony and that the expert witness reexamined the firearm after

24

being requested to do so by law enforcement. Although Petitioner complains trial counsel did not make use of a specific 2006 National Academy of Sciences report that raises questions about the science of ballistics, the transcript reveals trial counsel indeed questioned the expert about this report. (Doc. 13-1 at 1238-40); *see also Anderson v. Kelley*, 938 F.3d 949, 955-56 (8th Cir. 2019) (finding no *Martinez* violation where counsel did not seek mental diagnoses as "duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up") (quoting *Rompilla v. Beard*, 545 U.S. 374, 383 (2005)).

Petitioner also fails to establish prejudice in light of the overwhelming evidence of guilt. *See Sanders v. Trickey*, 875 F.2d 205, 210 (8th Cir. 1989) (holding, "Since appellant offers only speculation that he was prejudiced by the failure of his counsel to interview [a witness], he has not made the required showing of prejudice under *Strickland*.").

Because Petitioner fails to establish that post-conviction relief counsel were ineffective under *Strickland*, he thus has failed to establish "cause" to excuse his procedural default.[14] As a result, this ground is procedurally defaulted.

Ground Five is denied.

**F. Ground Six – Admission of Forensic Evidence**

Petitioner next claims the trial court erred in allowing the government to present "shoddy" forensic evidence at his trial. Petitioner again concedes this claim is procedurally defaulted on federal habeas review.

As noted above, a federal habeas court may not review procedurally defaulted claims "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. To demonstrate cause, a petitioner must show that "some objective factor external to the defense impeded [the petitioner's] efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 491 (1986). To establish prejudice, a petitioner must demonstrate that the claimed errors "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982). Lastly, in order to assert the fundamental miscarriage

---

[14] Petitioner additionally fails to show that a fundamental miscarriage of justice will result if this or any other defaulted claim is not considered. *See Murphy v. King*, 652 F.3d 845, 850 (8th Cir. 2011) (a petitioner must present new evidence that affirmatively demonstrates he is actually innocent of the crime for which he was convicted in order to fit within the fundamental miscarriage of justice exception).

of justice exception, a petitioner must "'present new evidence that affirmatively demonstrates that he is innocent of the crime for which he was convicted.'" *Murphy v. King*, 652 F.3d 845, 850 (8th Cir. 2011) (quoting *Abdi v. Hatch*, 450 F.3d 334, 338 (8th Cir. 2006)).[15]

Here, Petitioner has not demonstrated cause and actual prejudice to overcome his default, nor has he established a fundamental miscarriage of justice would otherwise exist were this claim not analyzed on the merits. *Ex gratia*, the Court notes Petitioner did not challenge the sufficiency of the evidence, and in light of the overwhelming evidence of guilt, any error was harmless. *See Feather v. United States*, 18 F.4th 982, 985-86 (8th Cir. 2021) (affirming trial court's denial of habeas relief because even if reliance on scientific evidence was outdated, fundamental fairness of trial was not undermined where there was ample other evidence of guilt beyond a reasonable doubt).

Ground Six is denied.

## G. Ground Seven – Appearance of Impropriety

As best as can be discerned, Petitioner contends he is entitled to federal habeas relief either because the trial court judge harbored bias against him or because a reasonable person with knowledge of all the facts and circumstances would find the appearance of impropriety and bias. Specifically, Petitioner claims error (1) as to the denial of his motion to disqualify the trial judge, which was filed only in post-conviction proceedings, and (2) as to the trial judge's decision not to recuse *sua sponte* from his criminal case.[16]

The Missouri Supreme Court examined this two-part claim as follows:

> Hosier did not object to Judge Joyce presiding over his criminal trial, nor did he claim on direct appeal that Judge Joyce should have recused herself *sua sponte*. He did, however, move to disqualify Judge Joyce from presiding over his postconviction proceeding, and this Court appointed Judge Gary Oxenhandler to hear that motion and rule on it.
>
> Hosier based both his motion to disqualify Judge Joyce from presiding over his postconviction proceeding and his claim that she should have recused herself *sua sponte* in his criminal case on the same facts. Before overruling Hosier's motion to disqualify Judge Joyce, Judge Oxenhandler held an evidentiary hearing

---

[15] Although Petitioner claims he is entitled to review of this claim under *Martinez*, Respondent correctly notes this exception applies only to otherwise procedurally defaulted claims of ineffective assistance of trial counsel. *Dansby v. Hobbs*, 766 F.3d 809, 833 (8th Cir. 2014). *Ex gratia*, the Court notes the claim is not substantial under *Martinez*.

[16] For ease of analysis, the claims are addressed in the order considered by the Missouri Supreme Court.

and found the following facts. Judge Joyce previously served as an assistant prosecuting attorney in Cole County. In that capacity, she represented the state in numerous child support enforcement cases. In one of those child support enforcement cases, decades ago, Judge Joyce was the attorney of record for Hosier's ex-wife, who was then owed child support from her previous husband. Judge Joyce had no memory of having any contact with the ex-wife during that case. In fact, Judge Oxenhandler found the ex-wife was a party in name only in the child support enforcement action and that Judge Joyce actually represented the state as the real party in interest. Ultimately, Judge Oxenhandler overruled the motion to disqualify Judge Joyce because her representation in the long-ago child support enforcement action would have no impact on her ability to preside over Hosier's postconviction proceeding and because no reasonable person in possession of the relevant facts would believe there was even an appearance of impropriety in her doing so.

Hosier now claims – for the first time in his Rule 29.15 motion – that Judge Joyce erred by not recusing herself *sua sponte* in his criminal case. Both points failed below, and he pursues both of them in this appeal. The Court rejects both arguments.

### A.  Judge Oxenhandler's Ruling on Hosier's Motion to Disqualify Judge Joyce in Postconviction Proceeding

The Court reviews a ruling on a motion to disqualify only for an abuse of discretion. *McLaughlin v. State*, 378 S.W.3d 328, 338 (Mo. banc 2012). A motion to disqualify should be granted if "a reasonable person would have factual grounds to find an appearance of impropriety and doubt the impartiality of the court." *State v. Smulls*, 935 S.W.2d 9, 17 (Mo. banc 1996). "[A] disqualifying bias or prejudice is one that has an extrajudicial source and results in an opinion on the merits on some basis other than what the judge learned from the judge's participation in a case." *Anderson v. State*, 402 S.W.3d 86, 91 (Mo. banc 2013) (quotation marks omitted).

Judge Oxenhandler did not abuse his discretion. Hosier's motion rests entirely on a 25-year-old child support enforcement matter of which Judge Joyce had no recollection and in which she did not interact with Hosier's ex-wife or anyone connected to Hosier's criminal case. Instead, it was merely one of thousands of such cases in which she participated. No reasonable person with knowledge of these facts would find even an appearance of impropriety in Judge Joyce's ability to preside over Hosier's postconviction proceedings. *Smulls*, 935 S.W.2d at 17.

### B.  Judge Joyce's Decision not to Recuse from Criminal Proceeding

Separate and apart from Hosier's motion to disqualify Judge Joyce from presiding over his postconviction proceedings, Hosier claims that he is entitled to

27

postconviction relief because Judge Joyce should have recused herself *sua sponte* in his criminal case. To be clear, Hosier challenges only Judge Joyce's actions and does not claim his defense counsel were ineffective for failing to move to disqualify her in his criminal case.

*Hosier*, 593 S.W.3d at 93-94.

Hosier has waived his challenge to Judge Joyce's failure to recuse herself *sua sponte* in his criminal case by failing to raise that claim at any time during his criminal case, including on appeal. "Post-conviction relief under Rule 29.15 is not a substitute for direct appeal or to obtain a second chance at appellate review." *McLaughlin*, 378 S.W.3d at 357. Accordingly, the motion court did not err in rejecting this claim.

As to Petitioner's claim concerning the motion filed in post-conviction proceedings, Respondent correctly argues "an infirmity in a state post-conviction proceeding does not raise a constitutional issue cognizable in a federal habeas petition." *Gee v. Groose*, 110 F.3d 1346, 1351-52 (8th Cir. 1997) (citations omitted). Additionally, notwithstanding the procedural posture, Petitioner has not rebutted the state court findings of fact by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Grass*, 749 F.3d at 743. Specifically, as detailed above, Judge Oxenhandler found that Judge Joyce represented the State – not Petitioner's ex-wife – in a child support collection action; Judge Joyce never met Petitioner's ex-wife; and Judge Joyce never attended any hearings on behalf of the State. Additionally, Judge Oxenhandler found the 25-year-old child support matter "insignificant" and "just one of many thousands of child support collection cases that Judge Joyce handled." Petitioner fails to rebut these state court findings of fact by clear and convincing evidence.

As to Petitioner's claim the trial judge should have recused *sua sponte*, the Court similarly finds no error. As the Missouri Supreme Court held, the crux of Petitioner's claim is the trial judge should not have presided over Petitioner's case because she was a prosecutor in the Cole County Prosecutor's Office while Petitioner had an active child support case pending and the judge had some involvement in that case as a prosecutor for the State. The claim was procedurally defaulted when it was not raised on direct appeal. The Missouri Supreme Court did not review the claim on its merits, ruling that "Hosier has waived his challenge to Judge Joyce's failure to recuse herself *sua sponte* in his criminal case by failing to raise that claim at any time during his criminal case, including on appeal." Respondent correctly notes this is an independent and adequate state law procedural ground and results in the procedural default of this claim for purposes of federal habeas

review. *Murray*, 477 U.S. at 492. Moreover, Petitioner has not shown good cause and actual prejudice to overcome his default, nor has he established a fundamental miscarriage of justice.

Finally, the Missouri Supreme Court nonetheless addressed the matter on its merits, ruling that "[e]ven if Hosier had asserted an ineffective assistance of counsel claim based on defense counsel's failure to move to disqualify Judge Joyce in his criminal case, that claim would have failed because such a motion would have been meritless [in that] nothing about Judge Joyce's involvement in the decades-old child support enforcement matter would give a reasonable person with knowledge of those facts even the appearance of an impropriety in her presiding over Hosier's trial." *Hosier*, 593 S.W.3d at 94 n.6. *Ex gratia*, the Court notes Petitioner did not challenge the sufficiency of the evidence, and in light of the overwhelming evidence of guilt, any error was harmless. *See Anderson v. Goeke*, 44 F.3d at 679 (8th Cir. 1995) (holding that prosecutor's statements during closing argument only warrant federal habeas relief if petitioner can show the statements were "so egregious that they fatally infected the proceedings and rendered his entire trial fundamentally unfair."); *Johnson v. Strange*, No. 4:17-CV-1953 PLC, 2021 WL 3077661, at *9 (E.D. Mo. July 21, 2021) (petitioner's preserved contention that trial judge was not impartial because he lived in the neighborhood where crime occurred "is not among the situations that have been identified in which experience teaches that the probability of actual bias on the part of the judge is too high to be constitutionally tolerable, such as where the judge has a pecuniary interest in the outcome or where he has been the target of personal abuse or criticism from the party before him") (cleaned up; citations omitted); *Fuentes v. Frakes*, 4:19CV3060, 2020 WL 6888989, at *13 (D. Neb. Nov. 24, 2020) (petitioner's contentions the trial judge should have recused and trial counsel was ineffective for not seeking recusal did not warrant relief where state supreme court's findings accurately "represent[ed] the trial court record [in that] the record is devoid of any evidence that the trial judge had access to confidential information or even recalled representing Fuentes; that the trial judge used confidential, personal information in presiding over Fuentes' trial or sentencing; or that the trial judge was biased or prejudiced against Fuentes in any way"; "trial judge's representation of Fuentes 17 years earlier in a different criminal proceeding does not per se establish the trial judge's impartiality [sic]or bias.").

Ground Seven is denied.

### H. Ground Eight – Ineffective Assistance of Counsel: Biased Jurors

Petitioner next argues trial counsel were ineffective for failing to subject two jurors to

examination during voir dire.  Specifically, Petitioner contends the Missouri Supreme Court attributed a reasonable strategy for counsel's failure to thoroughly question and strike both jurors when no reasonable strategy existed.  Applying the familiar *Strickland* standard, the Missouri Supreme Court reviewed this claim on post-conviction appeal and denied relief, as follows:

> Hosier claims defense counsel were constitutionally ineffective for failing to move to strike two jurors from the venire panel.[17]  In voire dire, defense counsel utilized juror questionnaires that asked venirepersons to rank their opinion of the death penalty from "one" (strongly opposed) to "seven" (strongly in favor).  The questionnaire also asked the venirepersons to describe in detail their opinions and beliefs about the death penalty for a person found to have committed two deliberate first-degree murders.  Defense counsel employed a jury consultant to help interpret these surveys and assign individual rankings to the venirepersons based on their desirability for the defense.  At the evidentiary hearing, Counsel Zembles testified the defense was looking for those venirepersons who answered the question regarding the death penalty with a "four" or a "five" because she believed those who answered with a "one" would never make it on the jury and those who answered with a "two" or "three" likely would not make it on the jury.

> ### 1. Failure to Strike Juror R.M.

> First, Hosier argues defense counsel was ineffective for failing to move to strike Juror R.M. because he was realistically unable to consider a punishment other than death.  The motion court denied this claim, and its findings were not clearly erroneous.

> Juror R.M. indicated a numerical bias toward the death penalty of "seven," meaning he was strongly in favor of the death penalty.  In explaining his belief about the death penalty, however, Juror R.M. was more equivocal.  He wrote: "I believe in the death penalty for a person who commits murder but I feel you would have to know the circumstances that drove them to this."  Concerning life without parole, Juror R.M. wrote:  "[L]ife in prison doesn't seem like a fair sentence to me but again you would have to know the circumstances of the case."  Finally, Juror R.M. testified that his nephew had committed an armed robbery.

---

[17]  The Missouri Supreme Court included this footnote in its analysis:

> On appeal, Hosier's points relied on fail to state expressly whether he is claiming defense counsel were ineffective for failing to move to strike Juror R.M. and Juror M.O. for cause or for failing to use the defense's peremptory strikes to remove them from the venire.  Nevertheless, the gravamen of these points suggest it is the former because Hosier argues Juror R.M. and Juror M.O. were unfit to serve in that they "could not realistically consider life."  This seems to focus on Juror R.M.'s and Juror M.O.'s fitness to serve rather than on the virtually unassailable strategic decision as to which otherwise proper members of the venire the defense should exercise its peremptory strikes.  Accordingly, the Court will review Hosier's claims as asserting the former argument and not the latter.

After evaluating Juror R.M.'s responses to the questionnaire and voire dire, defense counsel decided not to challenge him because they categorized Juror R.M. as a "wagon joiner," meaning he would likely go along with the rest of the jury. Weighing in his favor (in the defense's eyes), Juror R.M. testified he could meaningfully consider a sentence of life without parole, he would not hold it against Hosier if Hosier did not testify, and he knew the burden was entirely on the state.

Unless a juror is unqualified to serve such that allowing him or her to serve constitutes structural error (which Hosier does not claim), the decision whether to challenge a juror is ordinarily a matter of trial strategy, which need only be reasonable. *See Anderson* [*v. State*], 196 S.W.3d [28] at 40 [(Mo. banc 2006)]. "The qualifications for a prospective juror are not determined from a single response, but rather from the entire examination." *State v. Deck*, 303 S.W.3d 527, 535 (Mo. banc 2010). "The trial judge evaluates the venire's responses and determines whether their views would prevent or substantially impair their performance as jurors (including the ability to follow instructions on the burden of proof)." *Id.* (quotation marks and alteration omitted).

The motion court found the decision not to move to strike Juror R.M. was a reasonable trial strategy. This finding is not clearly erroneous. Juror R.M. demonstrated he could serve with an open mind, that he would follow the court's instructions, and that he could give meaningful consideration to both a sentence of death and a sentence of life without parole (including that he would be able to sign either verdict if chosen as the foreperson). Juror R.M. was asked on several occasions whether he could consider life without parole as a meaningful sentence, and consistently responded that he could. If Hosier chose not to testify, Juror R.M. testified that he would not "put that on the scales" for the state and against Hosier. He also said the fact that there was evidence of a second homicide would not change his mind on whether life without parole could be a meaningful punishment. Finally, he expressed the opinion that he would have to know the circumstances of the case before assessing punishment. For these reasons, a motion to strike Juror R.M. likely would not have succeeded, and defense counsel's decision not to challenge him was a reasonable strategy. *Anderson*, 196 S.W.3d at 40.

Nor does it appear there was any prejudice to Hosier's decision not to move to strike Juror R.M. "[A] movant is entitled to a presumption of prejudice resulting from counsel's ineffective assistance during the jury selection process only if the movant can show that a biased venireperson ultimately served on the jury[.]" *Strong v. State*, 263 S.W.3d 636, 648 (Mo. banc 2008) (quotation marks omitted). For the reasons already explained, defense counsel lacked a sufficient basis to move to strike Juror R.M. from the venire. With no presumption of prejudice to aid him, Hosier wholly failed to show a reasonable probability that either the guilt or penalty phases of his trial would have been different had Juror R.M. not served. *Id.* at 648-49.

### 2. Failure to Strike Juror M.O.

Hosier similarly claims defense counsel were ineffective for failing to move to strike Juror M.O. The motion court denied this claim, and its findings were not clearly erroneous.

Juror M.O. indicated his opinion concerning the death penalty was a "five" on the scale of "one" (strongly opposed) to "seven" (strongly in favor). In explaining his answer, Juror M.O. wrote: "[I]f [Hosier] was convicted of two deliberate murders that, if it can be proven beyond all reasonable doubt that an individual planned and committed two murders, then the death penalty is a just and appropriate punishment." Concerning life without parole, he wrote: "Under the circumstances provided, I would say that a sentence of life in prison would represent a humanitarian gift." Juror M.O. wrote that, although a willful disregard for human life was "not something that can be met with a great deal of leniency," "the punishment must fit the crime. . . . " The death penalty should not be considered lightly. . . . A jury can be just as guilty of disregarding human life if they arbitrarily condemn someone to death." He further wrote, "Again, every circumstance is different and requires different considerations." Even though his father had been a sheriff's officer in Texas in the late 1980s, Juror M.O. testified that this fact would not make him on the side of law enforcement generally, and he testified his brother had been charged with and convicted of making "felony terroristic threats" to the brother's ex-wife. Finally, Juror M.O. said he tried "to be as unbiased as possible" in his professional career. The motion court found the decision not to move to strike Juror M.O. was reasonable trial strategy. This finding is not clearly erroneous.

As explained above, "[t]he qualifications for a prospective juror are not determined from a single response, but rather from the entire examination." *Deck*, 303 S.W.3d at 535. In ruling on a motion to strike, a "trial judge evaluates the venire's responses and determines whether their views would prevent or substantially impair their performance as jurors (including the ability to follow instructions on the burden of proof)." *Id.* (quotation marks omitted). In light of this standard and the evidence adduced during voir dire, there is no reason to believe that a motion to strike Juror M.O. would have – or should have – been sustained. Juror M.O. did not indicate a mind unalterably closed or an unwillingness or inability to follow the court's instructions. *Id.* Just the opposite. His written response focused on his need to know the circumstances of a crime before deciding on a just punishment and that he understood proof beyond a reasonable doubt would be required.

Because Juror M.O. was qualified to serve, Hosier was required to show both that defense counsel's decision not to move to strike Juror M.O. for cause was unreasonable and that he was prejudiced as a result. As with his claim regarding Juror R.M., Hosier made neither showing. The motion court's denial of this claim was not error.

32

*Hosier*, 593 S.W.3d at 89-91.

Once again, given the record and a thorough *Strickland*-based analysis, the state court's determinations did not result in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or in "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d)(1) - (2).[18]  In so ruling, the Court rejects Petitioner's claim that additional portions of post-conviction counsel's testimony concerning trial testimony not explicitly referenced in the state court decision, including statements that counsel had not reviewed jury questionnaires, should change the result.  As Respondent points out, however, Zembles testified the entire trial team reviewed the jury questionnaires (Doc. 13-7 at 93).[19]  Regardless, the follow-up questions to the jurors in question reflect reasonable strategy and cure any issues potentially raised by the juror's answer to the written questions.  *Rodriguez*, 17 F.3d at 226 (holding there can be no deficient performance for failure to make a meritless motion).

Further, in light of the overwhelming evidence of guilt as set out above, this Court agrees with the state court that Petitioner cannot establish prejudice under *Strickland*.  *See Young v. Bowersox*, 161 F.3d 1159, 1161 (8th Cir. 1998) (holding "an error by counsel does not warrant

---

[18] Respondent additionally correctly notes Petitioner's assertion of cumulative error is defaulted because he did not raise it in the state courts.  *Ex gratia*, the Court has reviewed this claim and record and finds no relief is warranted.

Petitioner additionally broadly claimed "structural error" in the state court and renews the argument here but does not set out facts supporting this contention apart from those relating to the two jurors in question.  (*See* Docs. 13-8 at 97; 13-9 at 103.)  Petitioner's claim of juror bias is non-meritorious as explained herein.  Given that the record indicates the jurors provided reasoned views, expressed they would follow the law, and indicated they would only impose a death sentence depending on the circumstances, Petitioner's derivative claim of structural error is without merit.

[19] Specifically, the transcript for the post-conviction evidentiary hearing at that citation reflects the following testimony:

Q.   Now, who reviewed the questionnaires after you received them?

A.   We all did.  Don and I and Tami Miller who was our mitigation specialist and who assists in jury selection by taking notes, giving input.  And I think our investigator assisted in jury selection, but I'm not sure if she reviewed the questionnaires.

Additionally, Zembles testified she did not "have an independent recollection of [the jurors in question], and – But, yes, always it comes down – it comes down to what's available."  (Doc. 13-7 at 113-14).

33

setting aside the judgment of a criminal proceeding on collateral attack if the error had no effect on the judgment"); *Wright v. Nix*, 928 F.2d 270, 273 (8th Cir. 1991) (holding that a petitioner must show if a different jury had been seated it would have acquitted him).

Ground Eight is denied.

## I.   Ground Nine – Ineffective Assistance of Counsel:  Victim Impact Evidence

Petitioner next contends he is entitled to relief in that trial counsel were ineffective for failing to object to victim impact evidence presented to the judge (and not the jury) because the testimony asks for a death sentence.

Barbara Eichholz, Victim's mother, testified two times after the jury found Petitioner guilty – once to the jury and once to the trial court.  The entirety of Ms. Eichholz's testimony to the *jury* was as follows:

Q.   Please state your name for the jurors.

A.   Barb Eichholz.

Q.   Miss Eichholz, what was your relationship to [Victim]?

A.   She was my daughter.

Q.   And how old was [Victim] when she was murdered?

A.   Oh, my.  Forty-five.

Q.   And would you have liked to have spent more time with your daughter?

A.   Why, yes.

Q.   And you need to tell the jurors briefly why.

A.   There were so many things we did together.  She had two sons, my grandsons, and a great grandson.  We all liked to go places together.  We barbecued.  We'd had a lot of family dinners, all holidays, birthdays for all the families.  She was just a joy to be around.

Q.   And do you miss her greatly?

A.   Oh, land, yes.  There's not a day goes by that I don't think about her.  And still I'll turn around and think, "I need to call [Victim]." about something.  It just comes to your mind.

Q.   And [Victim]'s sons that you mentioned, their names, please?

A.    I'm sorry.  I can't hear you.

Q.   What are [Victim]'s sons' names?

A.   Her oldest son is Joshua.  The second son is Dakota.  The grandson is Joshua James.

34

(Doc. 13-1 at 1574-75.)

Later, after the jury recommended death, Ms. Eichholz testified *outside the presence of the jury and to the judge* as follows:

> This is a very difficult time. I've started this impact statement numerous times, but always emotions get me off into someplace else. There's really no way to express the loss of your daughter. If writing this statement helps in the sentencing, then the pain will definitely be worth it.

> Please try and understand how all the family has been affected by this senseless act. None of us will ever look at life in the same way as we did before September 28th, 2009. This man took away a daughter, a mother of two sons, a grandmother, a sister, an aunt, and cousin. The senseless and hateful act has definitely and permanently changed our family's life forever. I buried my daughter because of this man's deed. No parent should ever have to do that.

> [Victim] was always a presence at holiday functions, birthdays, or any family affair. She loved her family and loved being a part of their lives. It's hard to believe that something like this can permanently affect a person, but it has. Since this act, I have lost interest in simple chores and functions, have stress and sleeplessness. I wake up and go to bed every day thinking of [Victim] and the things we'd do together. Just simple things like sharing a recipe, sharing an article in a magazine, talking about JJ, her grandson.

> The pain never goes away. Nights seem to be the most emotional time. I think, "Well, babe. We made it through another day. Hope tomorrow will bring us a little more closure." It's hard to believe that I won't hear her giggle today or ever again. Seems like the smallest thoughts of [Victim] can bring on tears, especially around certain dates and especially this past couple of months. There's still times I'll think or even say out loud, "I have to tell [Victim] this.", only to realize that she won't hear me [as punctuated in original].

> I see her son Josh who has recently graduated from college without her knowing it. She would have been so proud. Her son Dakota advancing in the Navy stationed on the USS Carl Vinson. And he's doing this without her praises that I know she would have given freely. And JJ, her only grandson, are all hurting. Her grandson still asks, "When is Granny Gilpin coming back to play with me?" He knows she's in Heaven, but only as much as an eight-year-old can truly understand. Her sister was devastated and has been on anti-depressants ever since [Victim]'s death. Both her brothers have also felt a great loss, as they were always close and sharing all types of activities.

> My daughter didn't get a chance on – a choice on September 28th. She was ambushed and murdered as she was going to work as a productive citizen. **Please, I beg of you, consider a choice of the death penalty for this cruel and selfish**

**man.  I realize at seventy-five I'll never live to see him put to death, but I still have the satisfaction of knowing that it will happen**.

I hope none of you in attendance today will ever have to be in my place. But I also know that's the only way you'll truly understand the pain this man has caused.  Thank you for your time and understanding.  **Our family appreciates your consideration and decision to use the death penalty in this case.**  Thank you.

(Doc. 13-1 at 1688-90 (emphases added).)

With the above *Martinez* framework in mind, the Court first addresses whether Petitioner's claim regarding victim impact statements is substantial.  As noted above, a claim is "insubstantial" if "it does not have any merit or . . . is wholly without factual support."  *Martinez*, 566 U.S. at 16.

Petitioner claims the comments made by Victim's mother to the sentencing judge violated *Booth v. Maryland*, 482 U.S. 496 (1987), in which the Supreme Court ruled the introduction of a victim impact statement at the sentencing phase of a capital murder trial violates the Eighth Amendment.  In *Booth*, the Supreme Court deemed invalid a state statute to the extent it required consideration of this information because it was irrelevant to a capital sentencing decision, and because its admission creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner.[20]  In opposing this argument, Respondent highlights that only "two or three total sentences from two pages of testimony from Victim's mother" are at issue here.  On this record, the Court questions Petitioner's claim that these few statements by Victim's mother made to the judge rise to the level of impermissible victim impact evidence, particularly in the context of the entirety of the victim impact evidence, which also included statements and testimony from other friends and relatives.  Nonetheless, the Court assumes without deciding that Petitioner's claim concerning the victim impact statements is substantial.  More specifically, the Court assumes without deciding that Victim's mother's testimony advocated the death penalty in violation of *Booth* and progeny, and thus the claim is

---

[20] *But see Payne v. Tennessee*, 501 U.S. 808 (1991) (overruling *Booth* in part and holding that if a state chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar; a state may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed*); Bosse v. Oklahoma*, 137 S. Ct. 1 (2016) (reaffirming that *Payne* specifically acknowledged its holding did not affect *Booth*'s prohibition on opinions about the crime, the defendant, and the appropriate punishment.).

substantial under *Martinez*.

Even with that assumption, Petitioner fails to establish post-conviction counsel were ineffective and thus has failed to establish cause to excuse his procedural default. As noted above, "[j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance[.]" *Strickland*, 466 U.S. at 689. There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*.

The Court finds post-conviction counsel were not deficient for failing to raise the claim. First, the testimony in question was brief, and, crucially, addressed only to the judge after the jury had already recommended a penalty of death. "[I]n reviewing the work of their peers, federal judges must begin with the presumption that state courts know and follow the law." *Dunn v. Reeves*, 121 S.Ct. 2405, 2511 (2011) (quotation omitted). "Or, in more concrete terms, a federal court may grant relief only if *every* fairminded jurist would agree that *every* reasonable lawyer would have made a different decision." *Id*. (quoting *Richter*, 562 U.S. at 101) (cleaned up; emphasis in original); *see also Harris v. Rivera*, 454 U.S. 339, 346 (1981) ("In bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions."). Petitioner has failed to rebut the presumption that the trial judge knew the law and followed the law by not listening to the few now-challenged comments that Victim's mother made to the court outside the presence of the jury. In other words, Petitioner's broad allegations fail to point to any part of the record indicating the alleged improper testimony to the trial judge led the court to an action that violates the Constitution, and thus post-conviction counsel were not deficient for failing to raise this claim. Based on the unrebutted presumption that the trial court knew and followed the law, the fact that the comments were few in the context of the witness's testimony and constituted a small part of the victim impact evidence overall, post-conviction counsel were not defective for failing to raise a claim.

In so ruling, the Court finds inapposite Petitioner's cited authority where the challenged impact testimony was presented only to a judge. In *Graham v. State*, 440 P.3d 309 (Alaska Ct. App. 2019), for instance, the Alaska Court of appeals reversed a 32-year-sentence for drunk-driving homicide for a first-time offender where the trial court allowed the victim's family to supplement their oral statements with

DVDs that contained photographic montages of Brooke's and Jordyn's lives, from

37

> their infancy to their teenage years, displayed to the accompaniment of music.
> These videos were the type of photo montage that would be displayed at a memorial
> service – and, together, the two videos ran more than a half an hour.

*Id.* at 327. The trial court also allowed the police chief, a police sergeant, and the victim's rights advocate to make statements, incorrectly ruling they qualified as victim impact statements. *Id.* at 327. The judge was "subject[ed] . . . to an hours-long drumbeat of grief and outrage." *Id.* at 328. Because of multiple legal errors, the case was reversed and assigned to a different judge for resentencing. *See also State v. Hess*, 23 A.3d 373, 393-94 (N.J. 2011) (finding ineffective assistance of counsel in part because of a 17-minute professionally produced video played at sentencing that included childhood photographs and video of the victim, poems, as well as popular, holiday, religious, and military music). Here, in contrast, the extent of the challenged victim impact statements was three sentences asking the trial court to consider and decide to use the full range of punishment. Petitioner's authority is simply inapposite.

Petitioner additionally fails to establish deficient performance because the record of Petitioner's post-conviction proceedings indicates that post-conviction counsel reviewed Petitioner's case and was familiar with the relevant legal issues. (Docs. 13-7, 13-8.) The record indicates, for example, that post-conviction counsel raised claims relating to objections trial counsel failed to make. (Doc. 13-8 at 98, 118.) To that end, Petitioner does not establish that post-conviction counsel's decision to raise certain issues in the post-conviction motion and omit others was not a reasonable exercise of professional judgment. *See Smith v. Robbins*, 528 U.S. 259, 288 (2000) (noting "[g]enerally only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome") (citation omitted); *Gee*, 110 F.3d at 1352 (reasonable appellate strategy requires an attorney to limit the appeal to those issues having the highest likelihood of success). That is particularly true given the paucity of the challenged testimony.

Further, there is no prejudice under *Strickland* because Petitioner's broad allegations fail to point to any part of the record indicating a reasonable probability the result of the proceeding would have been different, particularly given the trial court's decision matches the jury's conclusion and the three sentences in question are a small portion of the mother's complete testimony and are an even smaller portion of the victim impact portion of the trial. Additionally, as Defendant notes, Petitioner cannot establish prejudice because of the Missouri Supreme Court's

38

statutorily required proportionality-review of the death sentence ultimately imposed. *See* Mo. Rev. Stat. § 565.035.3.[21] During the analysis in this case, the Missouri Supreme Court determined first, Petitioner "has not argued that [his sentence was imposed under the influence of passion, prejudice, or any arbitrary factor], and there is nothing in the record that leads this Court to find the jury recommended the death penalty for any reasons aside from the evidence presented." *Hosier*, 454 S.W.3d at 899. Second, the Missouri Supreme Court determined the evidence presented at trial supported the finding of aggravating factors that would justify the imposition of the death penalty (here, Petitioner had one or more assaultive criminal convictions and the murder was committed while the offender was engaged in the commission of another unlawful homicide). *Id.* Third, the state court determined the sentence was proportional to the penalty imposed in similar cases, citing seven such cases. *Id.* Additionally, notwithstanding Petitioner's failure to demonstrate any error in the first instance, neither can Petitioner demonstrate that if counsel had objected to Victim's mother's testimony, the outcome of the sentencing phase would have been different.

In light of the strong presumption post-conviction counsel acted reasonably, the brief nature of the now-challenged statements, and the speculative nature of Petitioner's allegations of ineffectiveness, Petitioner fails to show post-conviction counsel provided ineffective assistance relating to the victim impact statements. In short, Petitioner's allegations in his petition, memorandum, and reply fail to establish cause to excuse his procedural default.

Ground Nine is denied.

## J.  Ground Ten – Ineffective Assistance of Counsel:  Expert Medical Testimony

Petitioner next claims trial counsel were ineffective for failing to call Dr. Bruce Harry, a forensic psychiatrist, to testify Petitioner experienced a stroke, which caused brain damage, and

---

[21] This statute provides:
With regard to the sentence, the supreme court shall determine:
(1)  Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and
(2)  Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection 2 of section 565.032 and any other circumstance found;
(3)  Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the offense, the strength of the evidence and the defendant.

39

Hosier's pre-existing mental illness affected his behavior. Dr. Harry reviewed Petitioner's records and examined Petitioner after the trial concluded at the request of post-conviction counsel. (Doc. 13-7 at 12.) The Missouri Supreme Court reviewed the post-conviction claim and affirmed the denial of relief, as follows:

### Counsel's Failure to Call a Medical Expert in the Penalty Phase

Hosier claims defense counsel were ineffective for introducing medical records regarding his mental health history into evidence in the penalty phase without calling an expert witness to interpret those records for the jury. One record was the result of Hosier's 96-hour involuntary commitment in Fulton State Hospital in 1986 after he struck his ex-wife in the face in front of his young children. This record indicated Hosier had been diagnosed with recurrent depression. The other record was from Audrain Medical Center in 2007 and showed Hosier recently had suffered a transient ischemic attack.[22] At the evidentiary hearing, Hosier presented the testimony of Dr. Bruce Harry, the former clinical director at Fulton State Hospital, who had been retained to perform a general psychiatric evaluation on Hosier.

### 1. Failure to Call a Psychiatrist in the Penalty Phase

Hosier claims defense counsel were constitutionally ineffective because their decision not to call an expert to interpret the 1986 Fulton State Hospital records and the 2007 Audrain Medical Center records for the jury accounts for the failure of the statutory mitigating circumstances he submitted, i.e., that the murder was committed while Hosier was under the influence of extreme mental or emotional disturbance and that Hosier's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired. *See* § 565.032.3(2), (6). The motion court rejected this ineffective assistance claim because there is no reasonable likelihood that an expert would have altered the outcome of the penalty phase. This finding is not clearly erroneous.

"Counsel's decision not to call a witness is presumptively a matter of trial strategy and will not support a claim of ineffective assistance of counsel unless the defendant clearly establishes otherwise." *Deck v. State*, 381 S.W.3d 339, 346 (Mo. banc 2012). "As a matter of trial strategy, the determination to not call a witness is virtually unchallengeable." *Worthington v. State*, 166 S.W.3d 566, 577 (Mo. banc 2005). "If a potential witness's testimony would not unqualifiedly support a defendant, the failure to call such a witness does not constitute ineffective assistance." *Id.* (quotation marks omitted). Instead, to prevail on a claim of ineffective assistance of counsel for failure to call a witness, a movant must show:

---

[22] The Missouri Supreme Court noted in a footnote: "Dr. Bruce Harry testified at the evidentiary hearing that a transient ischemic attack is a temporary decrease in blood flow and consequent loss of oxygen and glucose to part of the brain, with the resulting symptoms resembling those of a stroke."

"(1) counsel knew or should have known of the existence of the witness; (2) the witness could be located through reasonable investigation; (3) the witness would testify; and (4) the witness's testimony would have produced a viable defense." *Deck*, 381 S.W.3d at 346. In the penalty phase of a capital case, a viable defense "is one in which there is a reasonable probability that the additional mitigating evidence th[e] witness[ ] would have provided would have outweighed the aggravating evidence presented by the prosecutor resulting in the jury voting against the death penalty." *Id.* (footnote omitted).

Here, the motion court found there was no reason to believe that calling an expert to explain these medical records would have resulted in a "viable defense" otherwise unavailable to Hosier, and this finding is amply supported by the record. First, defense counsel were able to present Hosier's mental health defense at the penalty stage without a medical expert. Hosier's mother testified via video deposition regarding Hosier's father being killed in the line of duty when Hosier was a teenager and Hosier's subsequent troubles. A retired Jefferson City police officer, among others, testified regarding the 1986 incident that resulted in the 96-hour involuntary commitment to Fulton State Hospital. And, significantly, defense counsel used the state's own evidence (i.e., the Indiana conviction in which the judge recommended Hosier receive psychiatric treatment) to present their mitigation theory to the jury. With no showing that any helpful parts of the 1986 and 2007 medical records were beyond the understanding of the jury without an expert to explain them, defense counsel's decision to present their mental health mitigation theories without an expert was reasonable trial strategy.

*Hosier*, 593 S.W.3d at 87-89 (brackets in original).

Petitioner now claims the Missouri Supreme Court's ruling was unreasonable and contrary to Supreme Court law. Specifically, Petitioner claims the mental health mitigation was not adequately presented without an expert because: (1) no lay witness mentioned Petitioner had a stroke, (2) no lay witness explained that Petitioner's stroke and resulting brain damage would exacerbate his already existing mental illness, (3) counsel did not point out Petitioner suffered a stroke, and (4) no lay witness explained how Petitioner's mental illness would have affected his behavior at the time of his crime or how it would have been a mitigating circumstance present throughout his life that negatively affected his behavior generally.

Again, given the record and a thorough *Strickland*-based analysis, the state court's determinations did not result in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or in "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d)(1) - (2). In so

41

ruling, the Court agrees with the state court's determination that trial counsel were not deficient since trial counsel presented some mitigation theory through the State's evidence in the guilt phase. In fact, trial counsel highlighted Petitioner's psychiatric issues several times. (Doc. 13-1 at 1652-53, 1654, 1655, 1660, 1661.) As the state supreme court noted, other parts of Petitioner's mitigation strategy were presented through testimony of his mother and a retired police officer, both during the penalty phase. (*Id.* at 1580-88.) Also during the penalty phase, trial counsel presented mitigating testimony of Petitioner's pastor, of a former landlord who described Petitioner's depressive times, and of Petitioner's sister. Further, when the medical records were admitted, Petitioner's counsel did specifically note that Petitioner had suffered a mini-stroke. (*Id.* at 1639.)

Additionally, at the post-conviction evidentiary hearing, Dr. Harry testified Petitioner "did not want" "his trial lawyers [to] present a mental defect defense to the jury[.]" Although Dr. Harry could not "remember the exact reason" why, Dr. Harry "believe[d]" Petitioner's history "is one that he's very s[k]eptical of psychiatric and psychological and mental health-related issues, and for whatever reason does not have much faith in that." (Doc. 13-7 at 38.) The Eighth Circuit has held trial counsel is not ineffective for not presenting a defense that the client insisted trial counsel should not present. *See Jones v. Delo*, 56 F.3d 878, 885 (8th Cir. 1995); *LaRette v. Delo*, 44 F.3d 681, 685-86 (8th Cir. 1995) (counsel not ineffective where clients opposed efforts to produce mental health mitigation evidence).

Although Plaintiff's case may have benefitted from an investigation into the effects of the stroke on his mental health, based on the totality of the defense strategy, the decision not to do so does not here rise to the level of deficient performance. *See Anderson*, 938 F.3d at 957 (noting that although petitioner's case may have benefitted from investigation of Fetal Alcohol Spectrum Disorders, the court considers "'not what is prudent or appropriate, but only what is constitutionally compelled'") (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)). Trial counsel's decision here is not an error "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

As to the prejudice prong, the state court correctly concluded there is no prejudice because there is no reasonable likelihood Dr. Harry's testimony would have altered the outcome of the penalty phase. As an initial matter, much of Petitioner's long history of threats and violence occurred decades before Petitioner's 2007 stroke. Additionally, the Eighth Circuit has noted

42

complex psychological testimony is not always likely to persuade a jury. *See Middleton v. Roper*, 455 F.3d 838, 849 (8th Cir. 2006) (noting empirical evidence of insanity defense shows jurors are put off by the defense and regard it with suspicion). Finally, Petitioner has not shown a reasonable probability that the jury would have reached a different conclusion had they been presented with additional mental health evidence about the stroke, particularly given the jury had evidence of Petitioner's psychiatric history. *Anderson*, 938 F.3d at 958. In other words, based on the totality of the evidence before the jury, Petitioner has not shown a reasonable probability that the jury would have concluded the balance of aggravating and mitigating evidence did not warrant death had it been presented with one more mitigating circumstance. *See id.* (quoting *Strickland*, 466 U.S. at 695.)

Ground Ten is denied.[23, 24]

## K. Ground Eleven – Ineffective Assistance of Counsel: Petitioner's Childhood

Petitioner next claims trial counsel were ineffective for failing to investigate and present evidence about his childhood. In support, Petitioner attaches an affidavit from his sister indicating his father allegedly abused him, his family was broken after the murder of his father, his father molested his sister, Petitioner's bicycle was damaged by an airline and Petitioner did not want to file a claim, Petitioner sometimes had a withdrawn relationship with his sister's children, Petitioner would not let his sister touch his laundry, Petitioner needed help in school because of dyslexia, Petitioner wore a patch over his eye at school, and Petitioner could not advance in his career at the fire department because of his dyslexia. Petitioner points to trial testimony indicating his childhood was wonderful in contrast to the content of the affidavit. (Doc. 13-1 at 1456). Petitioner includes an affidavit from the post-conviction relief mitigation specialist indicating, *inter alia*, time constraints made it difficult to complete a full investigation. Petitioner seeks to invoke *Martinez*

---

[23] In this ground, Petitioner also asserts the state court was ineffective for failing to investigate this matter. This claim is defaulted because Petitioner did not present this distinct theory to the Missouri Supreme Court. As Respondent notes, because the default occurred based on the actions of post-conviction appellate counsel, *Martinez* cannot excuse the default. *Dansby*, 766 F.3d at 833. Nonetheless, after *ex gratia* review of the arguments and record, the Court finds any such failure-to-investigate claim insubstantial under *Martinez*.

[24] Petitioner attaches affidavits from jurors in support as well as a letter from the prosecutor. Petitioner has not filed a motion to expand the record in accordance with Rule 7, which allows presentation of affidavits "in the discretion of the judge." *See also* Fed. R. Evid. 606(b) (limiting juror testimony); Fed. R. Evid. 408(a) (prohibiting admission of compromise offers). *Ex gratia*, the Court has reviewed the exhibits for this ground and all other grounds and finds they would not alter the analysis.

43

to excuse the default.  Ultimately, however, assuming these exhibits are admissible, the Court finds this claim is insubstantial under *Martinez* and therefore is procedurally barred.

Petitioner's claim fails under both prongs of *Strickland*.  As to performance, "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist at sentencing."  *Wiggins*, 539 U.S. at 533; *Knowles v. Mirzayance*, 556 U.S. 111, 127 (2009) ("The law does not require counsel to raise every available nonfrivolous defense.").  The Court has already determined the defense put forth substantial mitigation evidence.[25]

Petitioner additionally cannot show prejudice.  Given the mitigation evidence that was adduced and the strength of the state's case, there is not a reasonable probability that the additional mitigation evidence proffered would have led the jury to assess instead a life sentence.  *See Anderson*, 938 F.3d at 957.  Moreover, not only was the proffered mitigation evidence not so compelling as to move any competent lawyer to pursue it, much of it also was cumulative.

Therefore, this claim is insubstantial under *Martinez* and post-conviction counsel could not have been ineffective for not pursuing it.

Ground Eleven is denied.

---

[25] Additionally, a review of the record reveals trial counsel highlighted positive aspects of Petitioner's childhood in order to demonstrate the significant negative effects of the death of Petitioner's father on Petitioner.  For instance, trial counsel argued:

> And his father was – As David was growing up, his father was his hero, his mentor. His father was the person who would – who taught him to hunt, who taught him to fish, who taught him all about guns.  This was a churchgoing family, happy family, spent lots of time at the lake fishing, swimming.  It's a practically Leave It To Beaver kind of situation.  Until April 13th, 1971, David's father who was an Indiana state policeman which is the equivalent of the Missouri State Highway Patrol – David's father went out on a call one night.  And while David was – This was two months after David's 16th birthday.  And while David was home in bed with his mom also in the house, the man that Glen Hosier was attempting to arrest along ironically with many, many other police officers who had surrounded the house – This was known to be a dangerous situation.  And Glen went in the house to try and arrest this guy, and the guy shot him in the head. . . .
> This was an absolute demarcation on David Hosier's life, not just in terms of changes in what went on around him, but in terms of changes of what went on within him. And I think it's fair to say based on the evidence that David Hosier never completely recovered from the changes that happened around him and the changes that happened within him as a result of his father's death.

(Doc. 13-1 at 1457.)  Such presentation demonstrated reasonable strategy.

44

### L.  Ground Twelve – Jury Misconduct

Petitioner next claims he is entitled to relief because "on information or belief" the jurors committed misconduct or were biased against him.  He explains,

> For instance, one area which may prove fruitful is the prior experience of jurors with domestic violence, and whether they were completely open about this experience when questioned about it during *voir dire*.  Because of the sensitive and private nature of domestic violence, Hosier suspects that some jurors may not revealed [sic] prior experiences that may have led counsel or the court to strike them for cause, or to use a peremptory strike to remove them from the jury.  In addition, Hosier suspects that the issue of ballistics evidence in this case may have engendered either outside research by jurors, or the introduction by some jurors of their own specialized knowledge of the subject into deliberations.[26]

(Doc. 9 at 257-58.)  Petitioner again concedes this claim is defaulted.  Petitioner seeks to invoke *Martinez* to excuse the default, but not only is the claim insufficiently pleaded, it is insubstantial under *Martinez*.

To comply with Rule 2(c) of the Rules Governing Section 2254 Proceedings, Petitioner must state specific, particularized facts that entitle him to relief for each ground specified.  *Adams v. Armontrout*, 897 F.2d 332, 333-34 (8th Cir. 1990) (holding that "to substantially comply with the Section 2254 Rule 2(c), a petitioner must state specific, particularized facts which entitle him or her to habeas corpus relief for each ground specified."  The petitioner's "facts must consist of sufficient detail to enable the court to determine, from the face of the petition alone, whether the petition merits further habeas corpus review.").  Petitioner did not allege specific facts concerning the jurors in question, nor did he provide citations to the record.

*Ex gratia*, Petitioner's default cannot be excused under *Martinez*.  Because Petitioner has pleaded no facts and no theories for relief, Petitioner cannot demonstrate that post-conviction counsel were ineffective for failing to bring a claim that Petitioner has not discovered.  In other words, Petitioner has not discovered a claim, so he cannot show post-conviction relief counsel were ineffective, nor can he show the claim "has some merit" under *Martinez*.  566 U.S. at 14.  Even if a proper claim could be discerned from Petitioner's habeas petition, it must fail because Petitioner cannot establish prejudice for the reasons previously explained.

Petitioner blames the failure to bring the claim, which he has not defined, in part on

---

[26] In his reply brief, Petitioner states "one juror who was located expressed a willingness to meet with counsel and an investigator, but then changed her mind due to the Delta Variant."  (Doc. 18 at 130.)

COVID-19, on trial counsel, direct appeal counsel, and post-conviction counsel.  *Martinez* does not excuse procedural default for the actions of trial counsel or direct appeal counsel.  *Dansby*, 766 F.3d 809, 833-34 (8th Cir. 2014).  Even if the COVID-19 pandemic affected Petitioner's ability to investigate juror misconduct starting in March of 2020, Petitioner had several years since his trial, which concluded November 26, 2013, to investigate juror misconduct.  That period of time before COVID-19 weighs against any such relief Petitioner requests since it does not support a finding of due diligence in attempting to discover the existence of such a claim.  *Holland v. Jackson*, 542 U.S. 649, 653 (2004) ("It is difficult to see, moreover, how respondent could claim due diligence given the 7-year delay.").  More to the point, there is no indication the evidence before Petitioner's counsel "amount[ed] to 'red flags pointing up'" to investigate this claim.  *Anderson*, 938 F.3d at 957 (quoting *Rompilla*, 545 U.S. at 383).

Additionally, to the extent Petitioner seeks a stay of this habeas petition while he returns to state court to litigate this matter, that request is denied.  Exhaustion occurs either through fair presentation of the claim or through a procedural default of the claim.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Coleman*, 501 U.S. at 731-32.  A stay should only be granted when a petitioner has shown "good cause" for his failure to present his claims to the state court in the first instance.  *Rhines v. Weber*, 544 U.S. 269, 277 (2005).  Here, Petitioner has not shown good cause for not presenting the claim to the state court, thus causing substantial delay, nor has he provided any indication the claims have merit.[27]

---

[27] Petitioner also broadly indicates he wishes to file an amended petition at some unspecified time due to the COVID-19 pandemic (Doc. 9 at 258-60).  Similarly, in his reply, Petitioner requests at various times that the Court allow Petitioner "to amend his petition to correct any alleged errors" if the Court finds that any of his claims run afoul of Rule 2(c).  (*See, e.g.*, Doc. 18 at 33, 98).

The scheduling order, filed March 15, 2021, states "[a]ny motions for extensions of time or for leave to amend . . . should be filed in the normal course."  (Doc. 10.)  More than a year after the scheduling order was entered, Petitioner has not filed a motion for leave to amend.

Rule 12 of the Rules Governing Section 2254 Cases states the Federal Rules of Civil Procedure apply when consistent with the Rules Governing Section 2254 Cases.  Accordingly, "[u]nder Rule 15(a) [of the Federal Rules of Civil Procedure], once a responsive pleading has been filed, a prisoner may amend the petition only by leave of court or by written consent of the adverse party."  *Mayle v. Felix*, 545 U.S. 644, 663 (2005) (cleaned up).  Federal Rule of Civil Procedure 15(a) requires that leave to amend should be freely given "when justice so requires."  While this is a permissive standard, leave to amend should not be granted when there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment."  *Foman v. Davis*, 371 U.S. 178, 182 (1962).

To the extent the Court could construe Petitioner's requests to file an amended petition as a motion for leave to file an amended petition, such motion would be denied (at a minimum) as futile because

46

Ground Twelve is denied.

## M. Ground Thirteen – *Brady*[28] Claim

Finally, Petitioner claims trial counsel were ineffective because "on information or belief" the State committed a *Brady* violation. Petitioner again concedes this point is defaulted. Petitioner seeks to invoke *Martinez* to excuse the default, but the claim is insubstantial under *Martinez*.

Once again, Petitioner fails to comply with Rule 2(c). Petitioner did not allege specific facts concerning *Brady* violations and only speculates the State failed to produce exculpatory evidence which prevented him from exploring lines of independent investigation, defense, or trial strategies. Petitioner has not identified what, if anything, the State suppressed. Nor has he shown how any alleged suppressed information was material to his case either because it was exculpatory or because it could have been used to impeach the State's witnesses. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). As noted above, several years have passed since the trial concluded, and Petitioner cites no facts supporting a *Brady* claim.

For the reasons stated as to Ground Twelve, Petitioner's default cannot be excused by *Martinez*, and the Court declines to stay the case.

Ground Thirteen is denied.

---

Petitioner has identified no additional allegations he could make to cure deficiencies, nor has he proffered an amended petition in accordance with Local Rule 15.1 ("A party filing a motion to amend or a motion for leave to file a pleading or other document that may not be filed as a matter of right must . . . [a]ttach the proposed pleading or other document."). *See Minneapolis Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc.*, 641 F.3d 1023, 1030 (8th Cir. 2011) (footnote in resistance to motion to dismiss requesting leave to amend in the event of dismissal is insufficient); *Dudek v. Prudential Sec., Inc.*, 295 F.3d 875, 880 (8th Cir. 2002) (where plaintiffs did not include a proposed amended pleading per local rule and describe changes they would make, district court did not abuse its discretion in granting motion to dismiss).

[28] *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (ruling "[t]he suppression of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.").

### N. Allegations of Cumulative Error

Petitioner argues at various times in his briefing that he is entitled to relief based on the cumulative deficiencies. However, as Respondent notes, Eighth Circuit precedent forecloses this argument. *Cole*, 623 F.3d at 1196 (citing *Hall v. Luebbers*, 296 F.3d 685, 692-93 (8th Cir. 2002)).

## IV. Conclusion and Certificate of Appealability[29]

For the reasons set forth above, Petitioner's petition for relief under 28 U.S.C. § 2254 is **DENIED**. Under 28 U.S.C. § 2253(c), the Court may issue a certificate of appealability only "where a petitioner has made a substantial showing of the denial of a constitutional right." To satisfy this standard, Petitioner must show that "reasonable jurists" would find the district court ruling on the constitutional claim(s) "debatable or wrong." *Tennard v. Dretke*, 542 U.S. 274, 276 (2004). Because Petitioner has not met this standard, a certificate of appealability is **DENIED**.

Accordingly, it is **ORDERED** that:

(1) the petition for writ of habeas corpus is **DENIED**; and

(2) the issuance of a certificate of appealability is **DENIED**.

**IT IS SO ORDERED.**

> /s/ Roseann A. Ketchmark
> ROSEANN A. KETCHMARK, JUDGE
> UNITED STATES DISTRICT COURT

DATED: April 14, 2022

---

[29] The Court additionally notes Petitioner's request for discovery and evidentiary hearing. An evidentiary hearing on a habeas petition is mandatory only if a petitioner was denied a "full and fair hearing in a state court, either at the time of the trial or in a collateral proceeding." *Townsend v. Sain*, 372 U.S. 293, 312 (1963). The Court need not hold an evidentiary hearing if the petitioner fails to allege facts sufficient to justify habeas relief. *Id.* The Court finds Petitioner's claims do not entitle him to relief and concludes that no further evidentiary development is required for the resolution of Petitioner's grounds. Further, Petitioner fails to demonstrate that an evidentiary hearing is warranted under the applicable standards set forth in 28 U.S.C. § 2254(e)(2). *See also Thomas v. Payne*, 960 F.3d 465, 474 (8th Cir. 2020) (holding "even if a petitioner alleges that his counsel's ineffectiveness caused him to omit an ineffective-assistance-at-trial claim in his initial-review postconviction proceeding, a district court may still deny a hearing if it finds the claim not 'substantial' or 'potentially meritorious.'") *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (explaining that "the decision to grant an evidentiary hearing" remains within the "sound discretion of district courts"). Similarly, Petitioner's request for discovery is also denied as Petitioner has not shown good cause inasmuch as his allegations do not give the court reason to believe, if the facts are fully developed, that he entitled to relief; nor has he shown that § 2254(e)(2) is satisfied. *See* Rule 6 of the Rules Governing Habeas Corpus Cases Under § 2254; *Newton v. Kemna*, 354 F3d 776, 783 (8th Cir. 2004).